# O'CONNOR ET AL. *v.* ORTEGA

No. 85–530.   Argued October 15, 1986—Decided March 31, 1987

710

O'CONNOR, J., announced the judgment of the Court and delivered an opinion in which REHNQUIST, C. J., and WHITE and POWELL, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 729. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 732.

*Jeffrey T. Miller* argued the cause for petitioners. With him on the briefs were *John K. Van de Kamp*, Attorney General of California, *Marvin Goldsmith*, Assistant Attorney General, and *Jeffrey T. Miller* and *Teresa Tan*, Deputy Attorneys General.

*Joel I. Klein*, by invitation of the Court, 475 U. S. 1006, argued the cause and filed a brief as *amicus curiae* in support of the judgment below. *Magno J. Ortega, pro se*, filed a brief as respondent.*

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE POWELL join.

This suit under 42 U. S. C. § 1983 presents two issues concerning the Fourth Amendment rights of public employees. First, we must determine whether the respondent, a public

---

*Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Geller, Alan I. Horowitz, Barbara L. Herwig,* and *John P. Schnitker* filed a brief for the United States as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Peter W. Morgan, Jack Novik, Burt Neuborne,* and *Michael Simpson;* and for the American Federation of State, County, and Municipal Employees, AFL-CIO, by *Richard Kirschner.*

employee, had a reasonable expectation of privacy in his office, desk, and file cabinets at his place of work. Second, we must address the appropriate Fourth Amendment standard for a search conducted by a public employer in areas in which a public employee is found to have a reasonable expectation of privacy.

I

Dr. Magno Ortega, a physician and psychiatrist, held the position of Chief of Professional Education at Napa State Hospital (Hospital) for 17 years, until his dismissal from that position in 1981. As Chief of Professional Education, Dr. Ortega had primary responsibility for training young physicians in psychiatric residency programs.

In July 1981, Hospital officials, including Dr. Dennis O'Connor, the Executive Director of the Hospital, became concerned about possible improprieties in Dr. Ortega's management of the residency program. In particular, the Hospital officials were concerned with Dr. Ortega's acquisition of an Apple II computer for use in the residency program. The officials thought that Dr. Ortega may have misled Dr. O'Connor into believing that the computer had been donated, when in fact the computer had been financed by the possibly coerced contributions of residents. Additionally, the Hospital officials were concerned with charges that Dr. Ortega had sexually harassed two female Hospital employees, and had taken inappropriate disciplinary action against a resident.

On July 30, 1981, Dr. O'Connor requested that Dr. Ortega take paid administrative leave during an investigation of these charges. At Dr. Ortega's request, Dr. O'Connor agreed to allow Dr. Ortega to take two weeks' vacation instead of administrative leave. Dr. Ortega, however, was requested to stay off Hospital grounds for the duration of the investigation. On August 14, 1981, Dr. O'Connor informed Dr. Ortega that the investigation had not yet been completed, and that he was being placed on paid administrative leave. Dr. Ortega remained on administrative leave until

the Hospital terminated his employment on September 22, 1981.

Dr. O'Connor selected several Hospital personnel to conduct the investigation, including an accountant, a physician, and a Hospital security officer. Richard Friday, the Hospital Administrator, led this "investigative team." At some point during the investigation, Mr. Friday made the decision to enter Dr. Ortega's office. The specific reason for the entry into Dr. Ortega's office is unclear from the record. The petitioners claim that the search was conducted to secure state property. Initially, petitioners contended that such a search was pursuant to a Hospital policy of conducting a routine inventory of state property in the office of a terminated employee. At the time of the search, however, the Hospital had not yet terminated Dr. Ortega's employment; Dr. Ortega was still on administrative leave. Apparently, there was no policy of inventorying the offices of those on administrative leave. Before the search had been initiated, however, petitioners had become aware that Dr. Ortega had taken the computer to his home. Dr. Ortega contends that the purpose of the search was to secure evidence for use against him in administrative disciplinary proceedings.

The resulting search of Dr. Ortega's office was quite thorough. The investigators entered the office a number of times and seized several items from Dr. Ortega's desk and file cabinets, including a Valentine's Day card, a photograph, and a book of poetry all sent to Dr. Ortega by a former resident physician. These items were later used in a proceeding before a hearing officer of the California State Personnel Board to impeach the credibility of the former resident, who testified on Dr. Ortega's behalf. The investigators also seized billing documentation of one of Dr. Ortega's private patients under the California Medicaid program. The investigators did not otherwise separate Dr. Ortega's property from state property because, as one investigator testified, "[t]rying to sort State from non-State, it was too much to do, so I gave it

up and boxed it up." App. 62. Thus, no formal inventory of the property in the office was ever made. Instead, all the papers in Dr. Ortega's office were merely placed in boxes, and put in storage for Dr. Ortega to retrieve.

Dr. Ortega commenced this action against petitioners in Federal District Court under 42 U. S. C. § 1983, alleging that the search of his office violated the Fourth Amendment. On cross-motions for summary judgment, the District Court granted petitioners' motion for summary judgment. The District Court, relying on *Chenkin* v. *Bellevue Hospital Center, New York City Health & Hospitals Corp.*, 479 F. Supp. 207 (SDNY 1979), concluded that the search was proper because there was a need to secure state property in the office. The Court of Appeals for the Ninth Circuit affirmed in part and reversed in part, 764 F. 2d 703 (1985), concluding that Dr. Ortega had a reasonable expectation of privacy in his office. While the Hospital had a procedure for office inventories, these inventories were reserved for employees who were departing or were terminated. The Court of Appeals also concluded—albeit without explanation—that the search violated the Fourth Amendment. The Court of Appeals held that the record justified a grant of partial summary judgment for Dr. Ortega on the issue of liability for an unlawful search, and it remanded the case to the District Court for a determination of damages.

We granted certiorari, 474 U. S. 1018 (1985), and now reverse and remand.

## II

The strictures of the Fourth Amendment, applied to the States through the Fourteenth Amendment, have been applied to the conduct of governmental officials in various civil activities. *New Jersey* v. *T. L. O.*, 469 U. S. 325, 334–335 (1985). Thus, we have held in the past that the Fourth Amendment governs the conduct of school officials, see *ibid.*, building inspectors, see *Camara* v. *Municipal Court*, 387 U. S. 523, 528 (1967), and Occupational Safety and Health

Act inspectors, see *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 312–313 (1978). As we observed in *T. L. O.*, "[b]ecause the individual's interest in privacy and personal security 'suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards,' . . . it would be 'anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'" 469 U. S., at 335 (quoting *Marshall* v. *Barlow's, Inc., supra*, at 312–313 and *Camara* v. *Municipal Court, supra*, at 530). Searches and seizures by government employers or supervisors of the private property of their employees, therefore, are subject to the restraints of the Fourth Amendment.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Our cases establish that Dr. Ortega's Fourth Amendment rights are implicated only if the conduct of the Hospital officials at issue in this case infringed "an expectation of privacy that society is prepared to consider reasonable." *United States* v. *Jacobsen*, 466 U. S. 109, 113 (1984). We have no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable. Instead, "the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion." *Oliver* v. *United States*, 466 U. S. 170, 178 (1984) (citations omitted).

Because the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context, it is essential first to delineate the boundaries of the workplace context. The workplace includes those areas and items that are related to work and are generally within the employer's control. At a hospital, for

example, the hallways, cafeteria, offices, desks, and file cabinets, among other areas, are all part of the workplace. These areas remain part of the workplace context even if the employee has placed personal items in them, such as a photograph placed in a desk or a letter posted on an employee bulletin board.

Not everything that passes through the confines of the business address can be considered part of the workplace context, however. An employee may bring closed luggage to the office prior to leaving on a trip, or a handbag or briefcase each workday. While whatever expectation of privacy the employee has in the existence and the outward appearance of the luggage is affected by its presence in the workplace, the employee's expectation of privacy in the *contents* of the luggage is not affected in the same way. The appropriate standard for a workplace search does not necessarily apply to a piece of closed personal luggage, a handbag, or a briefcase that happens to be within the employer's business address.

Within the workplace context, this Court has recognized that employees may have a reasonable expectation of privacy against intrusions by police. See *Mancusi* v. *DeForte*, 392 U. S. 364 (1968). As with the expectation of privacy in one's home, such an expectation in one's place of work is "based upon societal expectations that have deep roots in the history of the Amendment." *Oliver* v. *United States, supra,* at 178, n. 8. Thus, in *Mancusi* v. *DeForte, supra,* the Court held that a union employee who shared an office with other union employees had a privacy interest in the office sufficient to challenge successfully the warrantless search of that office:

> "It has long been settled that one has standing to object to a search of his office, as well as of his home. . . . [I]t seems clear that if DeForte had occupied a 'private' office in the union headquarters, and union records had been seized from a desk or a filing cabinet in that office, he would have had standing. . . . In such a 'private' of-

fice, DeForte would have been entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his union superiors." 392 U. S., at 369.

Given the societal expectations of privacy in one's place of work expressed in both *Oliver* and *Mancusi*, we reject the contention made by the Solicitor General and petitioners that public employees can never have a reasonable expectation of privacy in their place of work. Individuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer. The operational realities of the workplace, however, may make *some* employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official. Public employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation. Indeed, in *Mancusi* itself, the Court suggested that the union employee did not have a reasonable expectation of privacy against his union supervisors. 392 U. S., at 369. The employee's expectation of privacy must be assessed in the context of the employment relation. An office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees. Instead, in many cases offices are continually entered by fellow employees and other visitors during the workday for conferences, consultations, and other work-related visits. Simply put, it is the nature of government offices that others—such as fellow employees, supervisors, consensual visitors, and the general public—may have frequent access to an individual's office. We agree with JUSTICE SCALIA that "[c]onstitutional protection against *unreasonable* searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as em-

ployer," *post*, at 731, but some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable. Cf. *Katz* v. *United States*, 389 U. S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"). Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis.

The Court of Appeals concluded that Dr. Ortega had a reasonable expectation of privacy in his office, and five Members of this Court agree with that determination. See *post*, at 731–732 (SCALIA, J., concurring in judgment); *post*, at 732 (BLACKMUN, J., joined by BRENNAN, MARSHALL, and STEVENS, JJ., dissenting). Because the record does not reveal the extent to which Hospital officials may have had work-related reasons to enter Dr. Ortega's office, we think the Court of Appeals should have remanded the matter to the District Court for its further determination. But regardless of any legitimate right of access the Hospital staff may have had to the office as such, we recognize that the undisputed evidence suggests that Dr. Ortega had a reasonable expectation of privacy in his desk and file cabinets. The undisputed evidence discloses that Dr. Ortega did not share his desk or file cabinets with any other employees. Dr. Ortega had occupied the office for 17 years and he kept materials in his office, which included personal correspondence, medical files, correspondence from private patients unconnected to the Hospital, personal financial records, teaching aids and notes, and personal gifts and mementos. App. 14. The files on physicians in residency training were kept outside Dr. Ortega's office. *Id.*, at 21. Indeed, the only items found by the investigators were apparently personal items because, with the exception of the items seized for use in the administrative hearings, all the papers and effects found in the office were simply placed in boxes and made available to Dr. Ortega.

*Id.*, at 58, 62. Finally, we note that there was no evidence that the Hospital had established any reasonable regulation or policy discouraging employees such as Dr. Ortega from storing personal papers and effects in their desks or file cabinets, *id.*, at 44, although the absence of such a policy does not create an expectation of privacy where it would not otherwise exist.

On the basis of this undisputed evidence, we accept the conclusion of the Court of Appeals that Dr. Ortega had a reasonable expectation of privacy at least in his desk and file cabinets. See *Gillard* v. *Schmidt*, 579 F. 2d 825, 829 (CA3 1978); *United States* v. *Speights*, 557 F. 2d 362 (CA3 1977); *United States* v. *Blok*, 88 U. S. App. D. C. 326, 188 F. 2d 1019 (1951).

### III

Having determined that Dr. Ortega had a reasonable expectation of privacy in his office, the Court of Appeals simply concluded without discussion that the "search . . . was not a reasonable search under the fourth amendment." 764 F. 2d, at 707. But as we have stated in *T. L. O.*, "[t]o hold that the Fourth Amendment applies to searches conducted by [public employers] is only to begin the inquiry into the standards governing such searches. . . . [W]hat is reasonable depends on the context within which a search takes place." *New Jersey* v. *T. L. O.*, 469 U. S., at 337. Thus, we must determine the appropriate standard of reasonableness applicable to the search. A determination of the standard of reasonableness applicable to a particular class of searches requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States* v. *Place*, 462 U. S. 696, 703 (1983); *Camara* v. *Municipal Court*, 387 U. S., at 536–537. In the case of searches conducted by a public employer, we must balance the invasion of the employees' legitimate expectations of pri-

vacy against the government's need for supervision, control, and the efficient operation of the workplace.

"[I]t is settled . . . that 'except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.'" *Mancusi* v. *DeForte*, 392 U. S., at 370 (quoting *Camara* v. *Municipal Court, supra,* at 528–529). There are some circumstances, however, in which we have recognized that a warrant requirement is unsuitable. In particular, a warrant requirement is not appropriate when "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Camara* v. *Municipal Court, supra,* at 533. Or, as JUSTICE BLACKMUN stated in *T. L. O.*, "[o]nly in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." 469 U. S., at 351 (concurring in judgment). In *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307 (1978), for example, the Court explored the burdens a warrant requirement would impose on the Occupational Safety and Health Act regulatory scheme, and held that the warrant requirement was appropriate only after concluding that warrants would not "impose serious burdens on the inspection system or the courts, [would not] prevent inspections necessary to enforce the statute, or [would not] make them less effective." 436 U. S., at 316. In *New Jersey* v. *T. L. O., supra,* we concluded that the warrant requirement was not suitable to the school environment, because such a requirement would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools.

There is surprisingly little case law on the appropriate Fourth Amendment standard of reasonableness for a public employer's work-related search of its employee's offices, desks, or file cabinets. Generally, however, the lower courts have held that any "work-related" search by an em-

ployer satisfies the Fourth Amendment reasonableness requirement. See *United States* v. *Nasser*, 476 F. 2d 1111, 1123 (CA7 1973) ("work-related" searches and seizures are reasonable under the Fourth Amendment); *United States* v. *Collins*, 349 F. 2d 863, 868 (CA2 1965) (upholding search and seizure because conducted pursuant to "the power of the Government as defendant's employer, to supervise and investigate the performance of his duties as a Customs employee"). Others have suggested the use of a standard other than probable cause. See *United States* v. *Bunkers*, 521 F. 2d 1217 (CA9 1975) (work-related search of a locker tested under "reasonable cause" standard); *United States* v. *Blok*, *supra*, at 328, 188 F. 2d, at 1021 ("No doubt a search of [a desk] without her consent would have been reasonable if made by some people in some circumstances. Her official superiors might reasonably have searched the desk for official property needed for official use"). The only cases to imply that a warrant should be required involve searches that are not work related, see *Gillard* v. *Schmidt*, *supra*, at 829, n. 1, or searches for evidence of criminal misconduct, see *United States* v. *Kahan*, 350 F. Supp. 784 (SDNY 1972).

The legitimate privacy interests of public employees in the private objects they bring to the workplace may be substantial. Against these privacy interests, however, must be balanced the realities of the workplace, which strongly suggest that a warrant requirement would be unworkable. While police, and even administrative enforcement personnel, conduct searches for the primary purpose of obtaining evidence for use in criminal or other enforcement proceedings, employers most frequently need to enter the offices and desks of their employees for legitimate work-related reasons wholly unrelated to illegal conduct. Employers and supervisors are focused primarily on the need to complete the government agency's work in a prompt and efficient manner. An employer may have need for correspondence, or a file or report available only in an employee's office while the employee is

away from the office. Or, as is alleged to have been the case here, employers may need to safeguard or identify state property or records in an office in connection with a pending investigation into suspected employee misfeasance.

In our view, requiring an employer to obtain a warrant whenever the employer wished to enter an employee's office, desk, or file cabinets for a work-related purpose would seriously disrupt the routine conduct of business and would be unduly burdensome. Imposing unwieldy warrant procedures in such cases upon supervisors, who would otherwise have no reason to be familiar with such procedures, is simply unreasonable. In contrast to other circumstances in which we have required warrants, supervisors in offices such as at the Hospital are hardly in the business of investigating the violation of criminal laws. Rather, work-related searches are merely incident to the primary business of the agency. Under these circumstances, the imposition of a warrant requirement would conflict with "the common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick* v. *Myers,* 461 U. S. 138, 143 (1983).

Whether probable cause is an inappropriate standard for public employer searches of their employees' offices presents a more difficult issue. For the most part, we have required that a search be based upon probable cause, but as we noted in *New Jersey* v. *T. L. O.,* "[t]he fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required.'" 469 U. S., at 340 (quoting *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 277 (1973) (POWELL, J., concurring)). Thus, "[w]here a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to

adopt such a standard." 469 U. S., at 341. We have concluded, for example, that the appropriate standard for administrative searches is not probable cause in its traditional meaning. Instead, an administrative warrant can be obtained if there is a showing that reasonable legislative or administrative standards for conducting an inspection are satisfied. See *Marshall* v. *Barlow's, Inc.*, 436 U. S., at 320; *Camara* v. *Municipal Court*, 387 U. S., at 538.

As an initial matter, it is important to recognize the plethora of contexts in which employers will have an occasion to intrude to some extent on an employee's expectation of privacy. Because the parties in this case have alleged that the search was either a noninvestigatory work-related intrusion or an investigatory search for evidence of suspected work-related employee misfeasance, we undertake to determine the appropriate Fourth Amendment standard of reasonableness *only* for these two types of employer intrusions and leave for another day inquiry into other circumstances.

The governmental interest justifying work-related intrusions by public employers is the efficient and proper operation of the workplace. Government agencies provide myriad services to the public, and the work of these agencies would suffer if employers were required to have probable cause before they entered an employee's desk for the purpose of finding a file or piece of office correspondence. Indeed, it is difficult to give the concept of probable cause, rooted as it is in the criminal investigatory context, much meaning when the purpose of a search is to retrieve a file for work-related reasons. Similarly, the concept of probable cause has little meaning for a routine inventory conducted by public employers for the purpose of securing state property. See *Colorado* v. *Bertine*, 479 U. S. 367 (1987); *Illinois* v. *Lafayette*, 462 U. S. 640 (1983). To ensure the efficient and proper operation of the agency, therefore, public employers must be given wide latitude to enter employee offices for work-related, noninvestigatory reasons.

We come to a similar conclusion for searches conducted pursuant to an investigation of work-related employee misconduct. Even when employers conduct an investigation, they have an interest substantially different from "the normal need for law enforcement." *New Jersey* v. *T. L. O.*, *supra*, at 351 (BLACKMUN, J., concurring in judgment). Public employers have an interest in ensuring that their agencies operate in an effective and efficient manner, and the work of these agencies inevitably suffers from the inefficiency, incompetence, mismanagement, or other work-related misfeasance of its employees. Indeed, in many cases, public employees are entrusted with tremendous responsibility, and the consequences of their misconduct or incompetence to both the agency and the public interest can be severe. In contrast to law enforcement officials, therefore, public employers are not enforcers of the criminal law; instead, public employers have a direct and overriding interest in ensuring that the work of the agency is conducted in a proper and efficient manner. In our view, therefore, a probable cause requirement for searches of the type at issue here would impose intolerable burdens on public employers. The delay in correcting the employee misconduct caused by the need for probable cause rather than reasonable suspicion will be translated into tangible and often irreparable damage to the agency's work, and ultimately to the public interest. See 469 U. S., at 353 ("The time required for a teacher to ask the questions or make the observations that are necessary to turn reasonable grounds into probable cause is time during which the teacher, and other students, are diverted from the essential task of education"). Additionally, while law enforcement officials are expected to "schoo[l] themselves in the niceties of probable cause," *id.*, at 343, no such expectation is generally applicable to public employers, at least when the search is not used to gather evidence of a criminal offense. It is simply unrealistic to expect supervisors in most government agencies to learn the subtleties of

the probable cause standard. As JUSTICE BLACKMUN observed in *T. L. O.*, "[a] teacher has neither the training nor the day-to-day experience in the complexities of probable cause that a law enforcement officer possesses, and is ill-equipped to make a quick judgment about the existence of probable cause." *Id.*, at 353. We believe that this observation is an equally apt description of the public employer and supervisors at the Hospital, and we conclude that a reasonableness standard will permit regulation of the employer's conduct "according to the dictates of reason and common sense." *Id.*, at 343.

Balanced against the substantial government interests in the efficient and proper operation of the workplace are the privacy interests of government employees in their place of work which, while not insubstantial, are far less than those found at home or in some other contexts. As with the building inspections in *Camara*, the employer intrusions at issue here "involve a relatively limited invasion" of employee privacy. 387 U. S., at 537. Government offices are provided to employees for the sole purpose of facilitating the work of an agency. The employee may avoid exposing personal belongings at work by simply leaving them at home.

In sum, we conclude that the "special needs, beyond the normal need for law enforcement make the . . . probable-cause requirement impracticable," 469 U. S., at 351 (BLACKMUN, J., concurring in judgment), for legitimate work-related, noninvestigatory intrusions as well as investigations of work-related misconduct. A standard of reasonableness will neither unduly burden the efforts of government employers to ensure the efficient and proper operation of the workplace, nor authorize arbitrary intrusions upon the privacy of public employees. We hold, therefore, that public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness

under all the circumstances. Under this reasonableness standard, both the inception and the scope of the intrusion must be reasonable:

> "Determining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the . . . action was justified at its inception,' *Terry* v. *Ohio,* 392 U. S., at 20; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place,' *ibid."* *New Jersey* v. *T. L. O., supra,* at 341.

Ordinarily, a search of an employee's office by a supervisor will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file. Because petitioners had an "individualized suspicion" of misconduct by Dr. Ortega, we need not decide whether individualized suspicion is an essential element of the standard of reasonableness that we adopt today. See *New Jersey* v. *T. L. O., supra,* at 342, n. 8. The search will be permissible in its scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of . . . the nature of the [misconduct]." 469 U. S., at 342.

## IV

In the procedural posture of this case, we do not attempt to determine whether the search of Dr. Ortega's office and the seizure of his personal belongings satisfy the standard of reasonableness we have articulated in this case. No evidentiary hearing was held in this case because the District Court acted on cross-motions for summary judgment, and granted petitioners summary judgment. The Court of Appeals, on the other hand, concluded that the record in this case justi-

fied granting partial summary judgment on liability to Dr. Ortega.

We believe that both the District Court and the Court of Appeals were in error because summary judgment was inappropriate. The parties were in dispute about the actual justification for the search, and the record was inadequate for a determination on motion for summary judgment of the reasonableness of the search and seizure. Petitioners have consistently attempted to justify the search and seizure as required to secure the state property in Dr. Ortega's office. Mr. Friday testified in a deposition that he had ordered members of the investigative team to "check Dr. Ortega's office out in order to separate the business files from any personal files in order to ascertain what was in his office." App. 50. He further testified that the search was initiated because he "wanted to make sure that we had our state property identified, and in order to provide Dr. Ortega with his property and get what we had out of there, in order to make sure our resident's files were protected, and that sort of stuff." *Id.*, at 51.

In their motion for summary judgment in the District Court, petitioners alleged that this search to secure property was reasonable as "part of the established hospital policy to inventory property within offices of departing, terminated or separated employees." Record Doc. No. 24, p. 9. The District Court apparently accepted this characterization of the search because it applied *Chenkin* v. *Bellevue Hospital Center, New York City Health & Hospitals Corp.*, 479 F. Supp. 207 (SDNY 1979), a case involving a Fourth Amendment challenge to an inspection *policy*. At the time of the search, however, Dr. Ortega had not been terminated, but rather was still on administrative leave, and the record does not reflect whether the Hospital had a policy of inventorying the property of investigated employees. Respondent, moreover, has consistently rejected petitioners' characterization of the search as motivated by a need to secure state property.

Instead, Dr. Ortega has contended that the intrusion was an investigatory search whose purpose was simply to discover evidence that would be of use in administrative proceedings. He has pointed to the fact that no inventory was ever taken of the property in the office, and that seized evidence was eventually used in the administrative proceedings. Additionally, Dr. O'Connor stated in a deposition that one purpose of the search was "to look for contractural [sic] and other kinds of documents that might have been related to the issues" involved in the investigation. App. 38.

Under these circumstances, the District Court was in error in granting petitioners summary judgment. There was a dispute of fact about the character of the search, and the District Court acted under the erroneous assumption that the search was conducted pursuant to a Hospital policy. Moreover, no findings were made as to the scope of the search that was undertaken.

The Court of Appeals concluded that Dr. Ortega was entitled to partial summary judgment on liability. It noted that the Hospital had no policy of inventorying the property of employees on administrative leave, but it did not consider whether the search was otherwise reasonable. Under the standard of reasonableness articulated in this case, however, the absence of a Hospital policy did not necessarily make the search unlawful. A search to secure state property is valid as long as petitioners had a reasonable belief that there was government property in Dr. Ortega's office which needed to be secured, and the scope of the intrusion was itself reasonable in light of this justification. Indeed, petitioners have put forward evidence that they had such a reasonable belief; at the time of the search, petitioners knew that Dr. Ortega had removed the computer from the Hospital. The removal of the computer—together with the allegations of mismanagement of the residency program and sexual harassment—may have made the search reasonable at its inception under the standard we have put forth in this case. As with the

District Court order, therefore, the Court of Appeals conclusion that summary judgment was appropriate cannot stand.

On remand, therefore, the District Court must determine the justification for the search and seizure, and evaluate the reasonableness of both the inception of the search and its scope.*

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in the judgment.

Although I share the judgment that this case must be reversed and remanded, I disagree with the reason for the reversal given by the plurality opinion, and with the standard it prescribes for the Fourth Amendment inquiry.

To address the latter point first: The plurality opinion instructs the lower courts that existence of Fourth Amendment protection for a public employee's business office is to be assessed "on a case-by-case basis," in light of whether the office is "so open to fellow employees or the public that no expectation of privacy is reasonable." *Ante,* at 718. No clue is provided as to how open "so open" must be; much less

---

*We have no occasion in this case to reach the issue of the appropriate standard for the evaluation of the Fourth Amendment reasonableness of the seizure of Dr. Ortega's personal items. Neither the District Court nor the Court of Appeals addressed this issue, and the *amicus curiae* brief filed on behalf of respondent did not discuss the legality of the seizure separate from that of the search. We also have no occasion in this case to address whether qualified immunity should protect petitioners from damages liability under § 1983. See *Davis* v. *Scherer,* 468 U. S. 183 (1984); *Harlow* v. *Fitzgerald,* 457 U. S. 800 (1982). The qualified immunity issue was not raised below and was not addressed by either the District Court or the Court of Appeals. Nor do we address the proper Fourth Amendment analysis for drug and alcohol testing of employees. Finally, we do not address the appropriate standard when an employee is being investigated for criminal misconduct or breaches of other nonwork-related statutory or regulatory standards.

is it suggested how police officers are to gather the facts necessary for this refined inquiry.  As we observed in *Oliver* v. *United States*, 466 U. S. 170, 181 (1984), "[t]his Court repeatedly has acknowledged the difficulties created for courts, police, and citizens by an ad hoc, case-by-case definition of Fourth Amendment standards to be applied in differing factual circumstances."  Even if I did not disagree with the plurality as to what result the proper legal standard should produce in the case before us, I would object to the formulation of a standard so devoid of content that it produces rather than eliminates uncertainty in this field.

Whatever the plurality's standard means, however, it must be wrong if it leads to the conclusion on the present facts that if Hospital officials had extensive "work-related reasons to enter Dr. Ortega's office" no Fourth Amendment protection existed.  *Ante*, at 718.  It is privacy that is protected by the Fourth Amendment, not solitude.  A man enjoys Fourth Amendment protection in his home, for example, even though his wife and children have the run of the place—and indeed, even though his landlord has the right to conduct unannounced inspections at any time.  Similarly, in my view, one's personal office is constitutionally protected against warrantless intrusions by the police, even though employer and co-workers are not excluded.  I think we decided as much many years ago.  In *Mancusi* v. *DeForte*, 392 U. S. 364 (1968), we held that a union employee had Fourth Amendment rights with regard to an office at union headquarters that he shared with two other employees, even though we acknowledged that those other employees, their personal or business guests, and (implicitly) "union higher-ups" could enter the office.  *Id.*, at 369.  Just as the secretary working for a corporation in an office frequently entered by the corporation's other employees is protected against unreasonable searches of that office by the government, so also is the government secretary working in an office frequently entered by other government employees.  There is no reason why this

determination that a legitimate expectation of privacy exists should be affected by the fact that the government, rather than a private entity, is the employer. Constitutional protection against *unreasonable* searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer.

I cannot agree, moreover, with the plurality's view that the reasonableness of the expectation of privacy (and thus the existence of Fourth Amendment protection) changes "when an intrusion is by a supervisor rather than a law enforcement official." *Ante*, at 717. The identity of the searcher (police v. employer) is relevant not to whether Fourth Amendment protections apply, but only to whether the search of a protected area is reasonable. Pursuant to traditional analysis the former question must be answered on a more "global" basis. Where, for example, a fireman enters a private dwelling in response to an alarm, we do not ask whether the occupant has a reasonable expectation of privacy (and hence Fourth Amendment protection) vis-à-vis firemen, but rather whether—given the fact that the Fourth Amendment covers private dwellings—intrusion for the purpose of extinguishing a fire is reasonable. Cf. *Michigan* v. *Tyler*, 436 U. S. 499, 509 (1978). A similar analysis is appropriate here.

I would hold, therefore, that the offices of government employees, and *a fortiori* the drawers and files within those offices, are covered by Fourth Amendment protections as a general matter. (The qualifier is necessary to cover such unusual situations as that in which the office is subject to unrestricted public access, so that it is "expose[d] to the public" and therefore "not a subject of Fourth Amendment protection." *Katz* v. *United States*, 389 U. S. 347, 351 (1967).) Since it is unquestioned that the office here was assigned to Dr. Ortega, and since no special circumstances are suggested that would call for an exception to the ordinary rule, I would

agree with the District Court and the Court of Appeals that Fourth Amendment protections applied.

The case turns, therefore, on whether the Fourth Amendment was violated—*i. e.*, whether the governmental intrusion was reasonable. It is here that the government's status as employer, and the employment-related character of the search, become relevant. While as a general rule warrantless searches are *per se* unreasonable, we have recognized exceptions when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable . . . ." *New Jersey* v. *T. L. O.*, 469 U. S. 325, 351 (BLACKMUN, J., concurring in judgment). Such "special needs" are present in the context of government employment. The government, like any other employer, needs frequent and convenient access to its desks, offices, and file cabinets for work-related purposes. I would hold that government searches to retrieve work-related materials or to investigate violations of workplace rules — searches of the sort that are regarded as reasonable and normal in the private-employer context — do not violate the Fourth Amendment. Because the conflicting and incomplete evidence in the present case could not conceivably support summary judgment that the search did not have such a validating purpose, I agree with the plurality that the decision must be reversed and remanded.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

The facts of this case are simple and straightforward. Dr. Ortega had an expectation of privacy in his office, desk, and file cabinets, which were the target of a search by petitioners that can be characterized only as investigatory in nature. Because there was no "special need," see *New Jersey* v. *T. L. O.*, 469 U. S. 325, 351 (1985) (opinion concurring in judgment), to dispense with the warrant and probable-cause requirements of the Fourth Amendment, I would evaluate the search by applying this traditional standard. Under that

standard, this search clearly violated Dr. Ortega's Fourth Amendment rights.

The problems in the plurality's opinion all arise from its failure or unwillingness to realize that the facts here are clear. The plurality, however, discovers what it feels is a factual dispute: the plurality is not certain whether the search was routine or investigatory. Accordingly, it concludes that a remand is the appropriate course of action. Despite the remand, the plurality assumes it must announce a standard concerning the reasonableness of a public employer's search of the workplace. Because the plurality treats the facts as in dispute, it formulates this standard at a distance from the situation presented by this case.

This does not seem to me to be the way to undertake Fourth Amendment analysis, especially in an area with which the Court is relatively unfamiliar.[1] Because this analysis, when conducted properly, is always fact specific to an extent, it is inappropriate that the plurality's formulation of a standard does not arise from a sustained consideration of a particular factual situation.[2] Moreover, given that *any* standard

---

[1] Although there has been some development on these issues in federal courts, see *ante*, at 720–721, this Court has not yet squarely faced them.

[2] It is true that this Court has expressed concern about the workability of " 'an ad hoc, case-by-case definition of Fourth Amendment standards to be applied in differing factual circumstances.' " *Ante*, at 730 (SCALIA, J., concurring in judgment), quoting *Oliver* v. *United States*, 466 U. S. 170, 181 (1984). Given, however, the number and types of workplace searches by public employers that can be imagined—ranging all the way from the employer's routine entry for retrieval of a file to a planned investigatory search into an employee's suspected criminal misdeeds—development of a jurisprudence in this area might well require a case-by-case approach. See *California* v. *Carney*, 471 U. S. 386, 400 (1985) (STEVENS, J., dissenting) ("The only true rules governing search and seizure have been formulated and refined in the painstaking scrutiny of case-by-case adjudication"); *New Jersey* v. *T. L. O.*, 469 U. S. 325, 366–367 (1985) (BRENNAN, J., concurring in part and dissenting in part) ("I would not think it necessary to develop a single standard to govern all school searches, any more than traditional Fourth Amendment law applies even the probable-cause standard

734

ultimately rests on judgments about factual situations, it is apparent that the plurality has assumed the existence of hypothetical facts from which its standard follows. These "assumed" facts are weighted in favor of the public employer,[3] and, as a result, the standard that emerges makes reasonable almost any workplace search by a public employer.

I

It is necessary to review briefly the factual record in this case because of the plurality's assertion, *ante*, at 728, that

to *all* searches and seizures" (emphasis in original)). Under a case-by-case approach, a rule governing a particular type of workplace search, unlike the standard of the plurality here, should emerge from a concrete set of facts and possess the precision that only the exploration of "every aspect of a multifaced situation embracing conflicting and demanding interests" can produce. See *United States* v. *Fruehauf*, 365 U. S. 146, 157 (1961). The manner in which the plurality arrives at its standard, it seems to me, thus not only harms Dr. Ortega and other public employees, but also does a disservice to Fourth Amendment analysis.

[3] It could be argued that the plurality removes its analysis from the facts of this case in order to arrive at a result unfavorable to public employees, whose position members of the plurality do not look upon with much sympathy. As Justice Cardozo long ago explained, judges are never free from the feelings of the times or those emerging from their own personal lives:

"I have spoken of the forces of which judges avowedly avail to shape the form and content of their judgments. Even these forces are seldom fully in consciousness. They lie so near the surface, however, that their existence and influence are not likely to be disclaimed. But the subject is not exhausted with the recognition of their power. Deep below consciousness are other forces, the likes and the dislikes, the predilections and the prejudices, the complex of instincts and emotions and habits and convictions, which make the man, whether he be litigant or judge." B. Cardozo, The Nature of the Judicial Process 167 (1921).

It seems to me that whenever, as here, courts fail to concentrate on the facts of a case, these predilections inevitably surface, no longer held in check by the "discipline" of the facts, and shape, more than they ever should and even to an extent unknown to the judges themselves, any legal standard that is then articulated. This, I believe, is the central problem of the opinion of the plurality and, indeed, of the concurrence.

"[t]here was a dispute of fact about the character of the search." The plurality considers it to be either an inventory search to secure government property or an investigative search to gather evidence concerning Dr. Ortega's alleged misdeeds. *Ante*, at 727–728. It is difficult to comprehend how, on the facts of this case, the search in any way could be seen as one for inventory purposes. As the plurality concedes, the search could not have been made pursuant to the Hospital's policy of routinely inventorying state property in an office of a terminated employee, because at the time of the search Dr. Ortega was on administrative leave and had not been terminated. *Ante*, at 712–713.[4] Napa had no policy of inventorying the office of an employee placed on administrative leave. *Ante*, at 713.

The plurality, however, observes that the absence of the policy does not dispositively eliminate inventorying or securing state property as a possible purpose for conducting the search. *Ante*, at 728. As evidence suggesting such a purpose, the plurality points to petitioners' concern that Dr. Ortega may have removed from the Hospital's grounds a computer owned by the Hospital and to their desire to secure such items as files located in Dr. Ortega's office. See *ante*, at 727–728.

The record evidence demonstrates, however, that ensuring that the computer had not been removed from the Hospital was not a reason for the search. Mr. Friday, the leader of the "investigative team," stated that the alleged removal of the computer had nothing to do with the decision to enter Dr. Ortega's office. App. 59. Dr. O'Connor himself admitted that there was little connection between the entry and an at-

---

[4] The plurality is correct in pointing out that the District Court erred in its conclusion that there was a Hospital policy that would have justified this search. *Ante*, at 728. This was not the only error on the District Court's part. That court also concluded that Dr. Ortega was notified of the search and could have participated in it, see App. 23, a conclusion at odds with the record, see *id.*, at 24, 40.

tempt by petitioners to ascertain the location of the computer. *Id.*, at 39. The search had the computer as its focus only insofar as the team was investigating practices dealing with its acquisition. *Id.*, at 32.

In deposition testimony, petitioners did suggest that the search was inventory in character insofar as they aimed to separate Dr. Ortega's personal property from Hospital property in the office. *Id.*, at 38, 40, 50. Such a suggestion, however, is overwhelmingly contradicted by other remarks of petitioners and particularly by the character of the search itself. Dr. O'Connor spoke of the individuals involved in the search as "investigators," see *id.*, at 37, and, even where he described the search as inventory in nature, he observed that it was aimed primarily at furthering investigative purposes. See, *e. g.*, *id.*, at 40 ("Basically what we were trying to do is to remove what was obviously State records or records that had to do with his program, his department, any of the materials that would be involved in running the residency program, around contracts, around the computer, around the areas that we were interested in investigating"). Moreover, as the plurality itself recognizes, *ante*, at 713–714, the "investigators" never made a formal inventory of what they found in Dr. Ortega's office. Rather, they rummaged through his belongings and seized highly personal items later used at a termination proceeding to impeach a witness favorable to him. *Ibid.* Furthermore, the search was conducted in the evening, App. 53, and it was undertaken only after the investigators had received legal advice, *id.*, at 51.

The search in question stemmed neither from a Hospital policy nor from a practice of routine entrances into Dr. Ortega's office. It was plainly exceptional and investigatory in nature. Accordingly, there is no significant factual dispute in this case.

## II

Before examining the plurality's standard of reasonableness for workplace searches, I should like to state both my

agreement and disagreement with the plurality's discussion of a public employee's expectation of privacy. What is most important, of course, is that in this case the plurality acknowledges that Dr. Ortega had an expectation of privacy in his desk and file cabinets, *ante*, at 719, and that, as the plurality concedes, *ante*, at 718, the majority of this Court holds that he had a similar expectation in his office. With respect to the plurality's general comments, I am in complete agreement with its observation that "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer." *Ante*, at 717. Moreover, I would go along with the plurality's observation that, in certain situations, the "operational realities" of the workplace may remove some expectation of privacy on the part of the employee. *Ibid.* However, I am disturbed by the plurality's suggestion, see *ante*, at 717–718, that routine entries by visitors might completely remove this expectation.

First, this suggestion is contrary to the traditional protection that this Court has recognized the Fourth Amendment accords to offices. See *Oliver* v. *United States*, 466 U. S. 170, 178, n. 8 (1984) ("The Fourth Amendment's protection of offices and commercial buildings, in which there may be legitimate expectations of privacy, is also based upon societal expectations that have deep roots in the history of the Amendment"); *Hoffa* v. *United States*, 385 U. S. 293, 301 (1966) ("What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile"). The common understanding of an office is that it is a place where a worker receives an occasional business-related visitor. Thus, when the office has received traditional Fourth Amendment protection in our cases, it has been with the understanding that such routine visits occur there.

Moreover, as the plurality appears to recognize, see *ante,* at 717–718, the precise extent of an employee's expectation of privacy often turns on the nature of the search. This observation is in accordance with the principle that the Fourth Amendment may protect an individual's expectation of privacy in one context, even though this expectation may be unreasonable in another. See *New Jersey* v. *T. L. O.,* 469 U. S., at 339. See also *Lo–Ji Sales, Inc.* v. *New York,* 442 U. S. 319, 329 (1979) (the opening of a retail store to the public does not mean that "it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees"). As JUSTICE SCALIA observes, "[c]onstitutional protection against *unreasonable* searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer." *Ante,* at 731. Thus, although an employee might well have no reasonable expectation of privacy with respect to an occasional visit by a fellow employee, he would have such an expectation as to an afterhours search of his locked office by an investigative team seeking materials to be used against him at a termination proceeding.[5]

---

[5] This common-sense notion that public employees have some expectation of privacy in the workplace, particularly with respect to private documents or papers kept there, was exemplified by recent remarks of the Attorney General. In responding to questions concerning the possibility of a search and seizure of papers and offices of Government employees in connection with an investigation into allegedly illegal diversion of funds to Central American recipients, he is reported to have stated: "I'm not sure we would have any opportunity or any legal right to get into those personal papers. . . . There was certainly no evidence of any criminality that would have supported a search warrant at that time. . . . I don't think public employees' private documents belong to the Government." N. Y. Times, Dec. 3, 1986, p. A11, col. 3.

Moreover, courts have recognized that a public employee has a legitimate expectation of privacy as to an employer's search and seizure at the workplace. See, *e. g., Gillard* v. *Schmidt,* 579 F. 2d 825, 829 (CA3 1978) (search of desk); *United States* v. *McIntyre,* 582 F. 2d 1221, 1224 (CA9 1978) (monitoring conversations at office desk). But see *Williams* v. *Col-*

Finally and most importantly, the reality of work in modern time, whether done by public or private employees, reveals why a public employee's expectation of privacy in the workplace should be carefully safeguarded and not lightly set aside. It is, unfortunately, all too true that the workplace has become another home for most working Americans. Many employees spend the better part of their days and much of their evenings at work. See R. Kanter, Work and Family in the United States: A Critical Review and Agenda for Research and Policy 31–32 (1977); see also R. Bellah, R. Madsen, W. Sullivan, A. Swidler, & S. Tipton, Habits of the Heart: Individualism and Commitment in American Life 288–289 (1985) (a "less frantic concern for advancement and a reduction of working hours" would make it easier for both men and women to participate fully in working and family life). Consequently, an employee's private life must intersect with the workplace, for example, when the employee takes advantage of work or lunch breaks to make personal telephone calls, to attend to personal business, or to receive personal visitors in the office. As a result, the tidy distinctions (to which the plurality alludes, see *ante*, at 715–716) between the workplace and professional affairs, on the one hand, and personal possessions and private activities, on the other, do not exist in reality.[6] Not all of an employee's pri-

---

*lins*, 728 F. 2d 721, 728 (CA5 1984) (search of desk). In some cases, courts have decided that an employee had no such expectation with respect to a workplace search because an established regulation permitted the search. See *United States* v. *Speights*, 557 F. 2d 362, 364–365 (CA3 1977) (describing cases); *United States* v. *Donato*, 269 F. Supp. 921 (ED Pa.), aff'd, 379 F. 2d 288 (CA3 1967) (Government regulation notified employees that lockers in the United States Mint were not to be viewed by employees as private lockers). The question of such a search pursuant to regulations is not now before this Court.

[6] Perhaps the greatest sign of the disappearance of the distinction between work and private life is the fact that women—the traditional representatives of the private sphere and family life—have entered the

vate possessions will stay in his or her briefcase or handbag. Thus, the plurality's remark that the "employee may avoid exposing personal belongings at work by simply leaving them at home," *ante*, at 725, reveals on the part of the Members of the plurality a certain insensitivity to the "operational realities of the workplace," *ante*, at 717, they so value.[7]

work force in increasing numbers. See BNA Special Report, Work & Family: A Changing Dynamic, 1, 3, 13–15 (1986). It is therein noted:

"The myth of 'separate worlds'—one of work and the other of family life—long harbored by employers, unions, and even workers themselves has been effectively laid to rest. Their inseparability is undeniable, particularly as two-earner families have become the norm where they once were the exception and as a distressing number of single parents are required to raise children on their own. The import of work-family conflicts—for the family, for the workplace, and, indeed, for the whole of society—will grow as these demographic and social transformations in the roles of men and women come to be more fully clarified and appreciated." *Id.*, at 217 (remarks of Professor Phyllis Moen).

As a result of this disappearance, moreover, the employee must attempt to maintain the difficult balance between work and personal life. *Id.*, at 227 (remarks of Barney Olmsted and Suzanne Smith).

[7] I am also troubled by the plurality's implication that a public employee is entitled to a lesser degree of privacy in the workplace because the public agency, not the employee, *owns* much of what constitutes the workplace. This implication emerges in the distinction the plurality draws between the workplace "context," which includes "the hallways, cafeteria, offices, desks, and file cabinets," and an employee's "closed personal luggage, a handbag, or a briefcase." *Ante*, at 715–716. This Court, however, has made it clear that privacy interests protected by the Fourth Amendment do not turn on ownership of particular premises. See, *e. g.*, *Rakas* v. *Illinois*, 439 U. S. 128, 143 (1978) ("[T]he protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place"); *Katz* v. *United States*, 389 U. S. 347, 353 (1967) (Fourth Amendment protects people and not simply "areas"). To be sure, the public employer's ownership of the premises is relevant in determining an employee's expectation of privacy, for often it is the main reason for the routine visits into an employee's office. The employee is assigned an office for work purposes; it is expected that the employee will receive work-related visitors and that the employer will main-

Dr. Ortega clearly had an expectation of privacy in his office, desk, and file cabinets, particularly with respect to the type of investigatory search involved here. In my view, when examining the facts of other cases involving searches of the workplace, courts should be careful to determine this expectation also in relation to the search in question.

## III

### A

At the outset of its analysis, the plurality observes that an appropriate standard of reasonableness to be applied to a public employer's search of the employee's workplace is arrived at from "balancing" the privacy interests of the employee against the public employer's interests justifying the intrusion. *Ante*, at 719–720. Under traditional Fourth Amendment jurisprudence, however, courts abandon the warrant and probable-cause requirements, which constitute the standard of reasonableness for a government search that the Framers established, "[o]nly in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable . . . ." *New Jersey* v. *T. L. O.*, 469 U. S., at 351 (opinion concurring in judgment); see *United States* v. *Place*, 462 U. S. 696, 721–722, and n. 1 (1983) (opinion concurring in judgment). In sum, only when the practical realities of a particular situation suggest that a government official cannot obtain a warrant based upon probable cause without sacrificing the ultimate goals to which a search would contribute, does the Court turn to a "balancing" test to formulate a standard of reasonableness for this context.

In *New Jersey* v. *T. L. O.*, *supra*, I faulted the Court for neglecting this "crucial step" in Fourth Amendment analysis. See 469 U. S., at 351. I agreed, however, with the *T. L. O.* Court's standard because of my conclusion that this step, had

tain the office. This fact of ownership, however, like the routine visits, does not abrogate the employee's expectation of privacy.

it been taken, would have revealed that the case presented a situation of "special need." *Id.*, at 353. I recognized that discipline in this country's secondary schools was essential for the promotion of the overall goal of education, and that a teacher could not maintain this discipline if, every time a search was called for, the teacher would have to procure a warrant based on probable cause. *Id.*, at 352–353. Accordingly, I observed: "The special need for an immediate response to behavior that threatens either the safety of schoolchildren and teachers or the educational process itself justifies the Court in excepting school searches from the warrant and probable-cause requirements, and in applying a standard determined by balancing the relevant interests." *Id.*, at 353.

The plurality repeats here the *T. L. O.* Court's error in analysis. Although the plurality mentions the "special need" step, *ante*, at 720, it turns immediately to a balancing test to formulate its standard of reasonableness. This error is significant because, given the facts of this case, no "special need" exists here to justify dispensing with the warrant and probable-cause requirements. As observed above, the facts suggest that this was an investigatory search undertaken to obtain evidence of charges of mismanagement at a time when Dr. Ortega was on administrative leave and not permitted to enter the Hospital's grounds. There was no special practical need that might have justified dispensing with the warrant and probable-cause requirements. Without sacrificing their ultimate goal of maintaining an effective institution devoted to training and healing, to which the disciplining of Hospital employees contributed, petitioners could have taken any evidence of Dr. Ortega's alleged improprieties to a magistrate in order to obtain a warrant.

Furthermore, this seems to be exactly the kind of situation where a neutral magistrate's involvement would have been helpful in curtailing the infringement upon Dr. Ortega's privacy. See *United States* v. *United States District Court*,

407 U. S. 297, 317 (1972) ("The historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech"). Petitioners would have been forced to articulate their exact reasons for the search and to specify the items in Dr. Ortega's office they sought, which would have prevented the general rummaging through the doctor's office, desk, and file cabinets. Thus, because no "special need" in this case demanded that the traditional warrant and probable-cause requirements be dispensed with, petitioners' failure to conduct the search in accordance with the traditional standard of reasonableness should end the analysis, and the judgment of the Court of Appeals should be affirmed.

## B

Even were I to accept the proposition that this case presents a situation of "special need" calling for an exception to the warrant and probable-cause standard, I believe that the plurality's balancing of the public employer's and the employee's respective interests to arrive at a different standard is seriously flawed. Once again, the plurality fails to focus on the facts. Instead, it arrives at its conclusion on the basis of "assumed" facts. First, sweeping with a broad brush, the plurality announces a rule that dispenses with the warrant requirement in every public employer's search of an employee's office, desk, or file cabinets because it "would seriously disrupt the routine conduct of business and would be unduly burdensome." *Ante*, at 722. The plurality reasons that a government agency could not conduct its work in an efficient manner if an employer needed a warrant for every routine entry into an employee's office in search of a file or correspondence, or for every investigation of suspected employee misconduct. In addition, it argues that the warrant requirement, if imposed on an employer who would be unfamiliar with this procedure, would prove "unwieldy." *Ibid.*

The danger in formulating a standard on the basis of "assumed" facts becomes very clear at this stage of the plurality's opinion. Whenever the Court has arrived at a standard of reasonableness other than the warrant and probable-cause requirements, it has first found, through analysis of a factual situation, that there is a nexus between this other standard, the employee's privacy interests, and the government purposes to be served by the search. Put another way, the Court adopts a new standard only when it is satisfied that there is no alternative in the particular circumstances.[8] In *Terry* v. *Ohio*, 392 U. S. 1, 20 (1968), the Court concluded that, as a practical matter, brief, on-the-spot stops of individuals by police officers need not be subject to a warrant. Still concerned, however, with the import of the warrant requirement, which provides the "neutral scrutiny of a judge," *id.*, at 21, the Court weighed in detail the law enforcement and the suspect's interests in the circumstances of the protective search. The resulting standard constituted the equivalent of the warrant: judging the officer's behavior from a reasonable or objective standard, *id.*, at 21, 27. In *Camara* v. *Municipal Court*, 387 U. S. 523 (1967), on the other hand, the Court declined to abandon the warrant as a standard in the case of a municipal health inspection in light of the interests of the target of the health investigation and those of the government in enforcing health standards. *Id.*, at 532–533.

---

[8] This part of the analysis is related to the "special need" step. Courts turn to the balancing test only when they conclude that the traditional warrant and probable-cause requirements are not a practical alternative. Through the balancing test, they then try to identify a standard of reasonableness, other than the traditional one, suitable for the circumstances. The warrant and probable-cause requirements, however, continue to serve as a model in the formulation of the new standard. It is conceivable, moreover, that a court, having initially decided that it is faced with a situation of "special need" that calls for balancing, may conclude after application of the balancing test that the traditional standard is a suitable one for the context after all.

A careful balancing with respect to the warrant requirement is absent from the plurality's opinion, an absence that is inevitable in light of the gulf between the plurality's analysis and any concrete factual setting. It is certainly correct that a public employer cannot be expected to obtain a warrant for every routine entry into an employee's workplace.[9] This situation, however, should not justify dispensing with a warrant in *all* searches by the employer. The warrant requirement is perfectly suited for many work-related searches, including the instant one.[10] Moreover, although the plurality abandons the warrant requirement, it does not explain what it will substitute or how the standard it adopts retains anything of the normal "neutral scrutiny of the judge."[11] In sum, the plurality's general result is preordained because, cut off from a particular factual setting, it cannot make the necessary distinctions among types of searches, or formulate an alternative to the warrant requirement that derives from a precise weighing of competing interests.

---

[9] In some workplace investigations, the particular goals of the government agency coupled with a need for special employee discipline may justify dispensing with the warrant requirement. See, *e. g., Security and Law Enforcement Employees, Dist. Council 82, American Federation of State, County and Municipal Employees, AFL–CIO* v. *Carey,* 737 F. 2d 187, 203–204 (CA2 1984) (government interest in maintaining security of a correctional facility justifies strip searches of correctional officers, in certain circumstances, in absence of a warrant).

[10] While the warrant requirement might be "unwieldy" for public employers if it was required for every workplace search, the plurality has failed to explain why, on the facts of this case, obtaining a warrant would have been burdensome for petitioners, even if one assumes that they were unfamiliar with this requirement. In fact, the opposite seems true. Moreover, contrary to the plurality's suggestion, see *ante,* at 722, the warrant requirement is not limited to the criminal context. See *Camara* v. *Municipal Court,* 387 U. S. 523, 530–531 (1967).

[11] The plurality adopts a "standard of reasonableness under all the circumstances." *Ante,* at 725–726. It fails completely to suggest how this standard captures any of the protection of the traditional warrant requirement; indeed, the standard appears to be simply an alternative to probable cause.

When the plurality turns to the balancing that will produce an alternative to probable cause, it states that it is limiting its analysis to the two situations arguably presented by the facts of this case—the "noninvestigatory work-related intrusion" (*i. e.,* inventory search) and the "investigatory search for evidence of suspected work-related employee misfeasance" (*i. e.,* investigatory search). *Ante,* at 723. This limitation, however, is illusory. The plurality describes these searches in such a broad fashion that it is difficult to imagine a search that would *not* fit into one or the other of the categories. Moreover, it proposes the *same* standard, one taken from *New Jersey* v. *T. L. O.,* for both inventory and investigatory searches. See *ante,* at 725–726. Therefore, in the context of remanding a case because the facts are unclear, the plurality is announcing a standard to apply to *all* public employer searches.

Moreover, the plurality also abandons any effort at careful balancing in arriving at its substitute for probable cause. Just as the elimination of the warrant requirement requires some nexus between its absence, the employee's privacy interests, and the government interests to be served by the search, so also does the formulation of a standard less than probable cause for a particular search demand a similar connection between these factors. See, *e. g., United States* v. *Brignoni-Ponce,* 422 U. S. 873, 881 (1975). The plurality's discussion of investigatory searches reveals no attempt to set forth the appropriate nexus.[12] It is certainly true, as the plurality observes, that a public employer has an interest in eliminating incompetence and work-related misconduct in order to enable the government agency to accomplish its tasks in an efficient manner. It is also conceivable that a public employee's privacy interests are somewhat limited in the workplace, although, as noted above, not to the extent suggested by the plurality. The plurality, however, fails to

---

[12] The same holds true for the plurality's discussion of inventory searches.

explain why the balancing of these interests *necessarily* leads to the standard borrowed from *New Jersey* v. *T. L. O.*, as opposed to other imaginable standards. Indeed, because the balancing is simply asserted rather than explicated,[13] the plurality never really justifies why probable cause, characterized by this Court as a "practical, nontechnical conception," *Brinegar* v. *United States*, 338 U. S. 160, 176 (1949), would not protect adequately the public employer's interests in the situation presented by this case. See *New Jersey* v. *T. L. O.*, 469 U. S., at 363–364 (BRENNAN, J., concurring in part and dissenting in part).[14]

---

[13] The plurality's attempt at explication consists of little more than a series of assertions: that the probable-cause requirement "would impose intolerable burdens on public employers"; that the delay caused by such a requirement would result in "tangible and often irreparable damage" to a government agency; and that public employers cannot be expected "to learn the subtleties of the probable cause standard." See *ante*, at 724–725. Such assertions cannot pass for careful balancing on the facts of this case, given that the search was conducted during Dr. Ortega's administrative leave from the Hospital, with the advice of counsel, and by an investigating party that included a security officer. My observation that a particular Fourth Amendment standard of reasonableness should be developed from a specific context bears repeating here.

[14] Even if I believed that this case were an appropriate vehicle for development of a standard on public-employer searches, I would fault the plurality for its failure to give much substance to the standard it has borrowed almost verbatim from *New Jersey* v. *T. L. O.* See *ante*, at 714–715. The *T. L. O.* Court described in some detail the substance of its test, which was tailored to the circumstances of the case before it and thus is not directly transferable from the halls of a high school to the offices of government. In any event, were I to apply the rather stark standard of reasonableness announced by the plurality, I would conclude that petitioners here did not satisfy it. Assuming, without deciding, that petitioners had an individualized suspicion that Dr. Ortega was mismanaging the psychiatric residency program, I believe the scope of the search was not reasonably related to this concern. If petitioners were truly in search of evidence of respondent's mismanagement, it is difficult to understand why they looked through the personal belongings of Dr. Ortega, a search that resulted in the seizure of a Valentine's Day card, a photograph, and a book of poetry, which could have no conceivable relation to the claimed purpose of the search. Although, in

## IV

I have reviewed at too great length the plurality's opinion because the question of public employers' searches of their employees' workplaces, like any relatively unexplored area of Fourth Amendment law, demands careful analysis. These searches appear in various factual settings, some of which courts are only now beginning to face, and present different problems.[15] Accordingly, I believe that the Court should examine closely the practical realities of a particular situation and the interests implicated there before replacing the traditional warrant and probable-cause requirements with some other standard of reasonableness derived from a balancing test. The Fourth Amendment demands no less. By ignoring the specific facts of this case, and by announcing in the abstract a standard as to the reasonableness of an employer's workplace searches, the plurality undermines not only the Fourth Amendment rights of public employees but also any further analysis of the constitutionality of public employer searches.

I respectfully dissent.

---

the plurality's view, the seizure of these items is not an issue in this case, see *ante*, at 729, n., I would think that this seizure is relevant to determining the reasonableness of the scope of the search. Accordingly, under the plurality's own standard, this search was unreasonable.

[15] One example is the Fourth Amendment problem associated with drug and alcohol testing of employees. See, *e. g., Shoemaker* v. *Handel*, 795 F. 2d 1136, 1141–1143 (CA3) (administrative-search exception extended to warrantless breath and urine testing of jockeys, given the heavily regulated nature of the horse-racing industry), cert. denied, 479 U. S. 986 (1986); *National Treasury Employees Union* v. *Von Raab*, 649 F. Supp. 380 (ED La. 1986) (wide-scale urinalysis of United States Customs Service employees without probable cause or reasonable suspicion struck down as violative of the Fourth Amendment).