Anthony M. HOLLOMAN, Plaintiff,

v.

**GREATER CLEVELAND REGIONAL TRANSIT AUTHORITY, Defendant.**

No. C88–0774.

United States District Court,
N.D. Ohio, E.D.

April 17, 1990.

Robert O. Garnett, Shaker Heights, Ohio, for plaintiff.

Russell Adrian, Andrew C. Meyer, Martin T. Wymer, Duvin, Cahn & Barnard, Cleveland, Ohio, for defendant.

## MEMORANDUM OF OPINION RE: GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KRENZLER, District Judge.

The Plaintiff, Anthony M. Holloman, filed a Complaint with this Court against his former employer, the Greater Cleveland Regional Transit Authority ("GCRTA") and against his collective bargaining representative, the Amalgamated Transit Union, Local 286 ("Union") and its president, Ronald W. Jackson.

In the Complaint plaintiff stated that; (1) GCRTA instituted a drug testing program without the authorization of the members of the Union, thereby breaching the collective bargaining agreement, (2) the Union failed to adequately represent, advise, or assist him, and (3) even if there were sufficient authority for the institution of the drug and alcohol testing program, said program violated the plaintiff's Constitutional rights of privacy and due process, and was unconstitutional because of vagueness.

GCRTA and the Union filed motions to dismiss plaintiff's first and second claims.[1] As the plaintiff had not exhausted his administrative remedies, this Court found that it was without jurisdiction to determine his allegations against the defendant GCRTA for breach of the collective bargaining agreement and against the Union for failure to fairly represent the plaintiff and dismissed said claims without prejudice.

Presently pending before the Court is Defendant's Motion For Summary Judgment on plaintiff's third claim under 42 U.S.C. § 1983, that the GCRTA violated his constitutional right to privacy by requiring him to submit to a series of drug tests following an accident involving a GCRTA bus driven by him and requiring him to submit to drug testing at his bi-annual physical. In support of the motion, defendant has submitted evidentiary material including affidavits of James Clark, the Director of Bus Transportation for the GCRTA, and Neil Fortner, the Scientific Director of Toxicology at Southgate Medical Laboratory, Inc., and a transcript of Plaintiff's Deposition. The plaintiff filed a brief in response supported by plaintiff's affidavit.

## I.

A review of the pleadings, deposition, affidavits and other evidentiary material reveals the following relevant facts.

The GCRTA is a regional transit authority which provides public transportation services to approximately 240,000 people daily in Northeastern Ohio. The GCRTA operates passenger buses, rapid transit lines, and special community responsive transit vehicles (designed to transport the physically handicapped). On a typical business day, there are over 550 buses in operation.

In February of 1986 the GCRTA implemented a comprehensive "Alcohol and Drug Abuse Policy" ("Drug Policy") designed to detect (1) employees who use drugs and/or alcohol on the job, and (2) employees who are chronic abusers of drugs and/or alcohol. Plaintiff received, read, and understood the Policy provisions.

The Drug Policy lists a variety of specific circumstances which mandate submission by an employee to toxicological testing for the presence of alcohol and drugs.[2]

---

1. This Court previously dismissed defendant Ronald W. Jackson, Sr., without prejudice, for failure to prosecute.

2. GCRTA ALCOHOL AND DRUG ABUSE POLICY

... [A]ny employee will be required to submit to testing ... under the following circumstances:

At the time of the pre-employment physical examination.

On December 8, while driving a GCRTA bus on a "swing run," plaintiff "rear-ended" a passenger automobile.[3] After plaintiff filed an accident report later that day, he was advised by his supervisor, that pursuant to the GCRTA Drug Policy, plaintiff would be required to submit to a drug test. His supervisor transported him to the main testing facility of Southgate Medical Laboratory, Inc.[4]

After verifying plaintiff's name and employee number a laboratory technician asked plaintiff to write his name on adhesive labels that were subsequently attached to his test samples. The technician then took two blood samples from plaintiff, and affixed initialed labels to the sample containers before placing them in a refrigerated unit. Plaintiff then provided a saliva sample which was also sealed with an adhesive label.

Plaintiff was next given a specimen jar, directed to a bathroom located off a partitioned area of the lab, and asked to provide a urine sample. No one entered the bathroom with plaintiff nor directly observed plaintiff provide the sample. After providing his sample, plaintiff handed the specimen container to the lab technician who then affixed an initialed adhesive label to the container in plaintiff's presence.

The specimen was subsequently analyzed for the presence of various psychoactive substances. The drug tests revealed a positive showing of marijuana in plaintiff's urine. On December 10, a representative of Southgate Laboratory contacted James Clark, the Assistant Director of Bus Transportation for the GCRTA, and advised him that plaintiff's urine specimen had tested positive for marijuana. That same day plaintiff was informed by District Superintendent Berry Grant that he had tested positive for marijuana. Subsequent to a pre-termination hearing plaintiff was discharged.

During a hearing to appeal his termination, plaintiff acknowledged smoking marijuana the day before the test, but in light of plaintiff's overall work record it was decided to convert plaintiff's discharge to a 30–day suspension, after which he was to be retested. This decision also provided that a second positive marijuana test at the end of this 30–day suspension would result in an additional 30–day suspension. A third positive test at the end of the two suspensions would result in an irrevocable termination. However, if any of those follow-up tests were negative, the GCRTA agreed to conditionally reinstate plaintiff, subject to random testing for three years after reinstatement. Detection of a non-prescription drug at a subsequent testing would result in his immediate discharge. This was reduced to writing and signed by the plaintiff.

Plaintiff served his 30–day suspension and on January 7, submitted to a second urinalysis at a medical facility located at the GCRTA's downtown headquarters. Plaintiff was directed to the facility's pri-

At the time of any work-related physical examination.

When two supervisors and/or Transit Police officers concur that the employee appears to be acting in an impaired manner.

When the employee is in an accident involving:

- a pedestrian
- a fixed object
- two or more RTA vehicles
- an RTA vehicle striking the rear end of another vehicle
- a head-on collision
- an RTA vehicle striking another vehicle broadside
- substantial physical damage
- personal injury

When an employee is in flagrant violation of standard operating procedures.

As a condition of discipline due to a previous offense.

When an employee returns from any unscheduled absence from work whereby two or more consecutive days of absence occurred, the employee may be required to submit to a test.

3. Plaintiff generally drove his bus on a run during the morning peak traffic hours, went home for several hours, then returned to drive a run during the late afternoon peak traffic hours.

4. Southgate Medical Laboratory, Inc. employs accepted procedures regarding the chain of custody of collected specimens and state-of-the-art testing technology. This laboratory has been certified by the Federal Department of Health and Human Services to conduct drug testing under the Department of Transportation drug testing regulations issued in 1988 (*See* 49 C.F.R. Part 653 (1988).

vate restroom by a physician. The restroom is located in a room adjacent to and separate from the main examining areas, with its own door. Plaintiff entered the restroom alone. No one entered with him, stood outside the door, or observed him as he provided the sample. Plaintiff then gave the sample to the receptionist and the same "chain of custody" procedures that had been followed on December 8, during plaintiff's first drug test were followed again on January 7.

Once again, plaintiff's urine tested positive for marijuana and plaintiff was again suspended for an additional 30 days.

On February 8, plaintiff was tested a third time. The place and procedure for this test was identical in all pertinent respects to the previous test in January. This time, the test results were negative and plaintiff was reinstated to full-time status. As part of the reinstatement process, plaintiff signed a statement in which he agreed to the conditions of his reinstatement,[5] waiving his Fourth Amendment right and stated that he understood that another violation of the GCRTA drug/narcotic policy would result in his immediate discharge. (Defense exhibit # 14 and plaintiff's deposition at 82).

Two months later, as part of his bi-annual physical examination, plaintiff was directed to produce a urine specimen. Production of a urine specimen is a routine part of the bi-annual physical examination. Plaintiff knew in advance that he would be required to produce a specimen at this exam as he had produced samples for his previous GCRTA physicals (plaintiff's depo. at 111–112). Plaintiff did not object to the procedure, impliedly waiving his Fourth Amendment right. The procedures for collection and testing were identical in all pertinent respects to those used in December, January, and February. Plaintiff's urine tested positive for marijuana, a result confirmed by the "GC/MS" test. This test provides a "fingerprint" of the molecular structure of the metabolites contained in the urine and revealed the presence of the THC metabolite in plaintiff's urine. As a result plaintiff was terminated pursuant to the requirements of the GCRTA's Drug Policy.

In summary, Plaintiff Holloman was involved in a rear-end collision while driving a GCRTA bus. He was given a drug test on the same day. He tested positive for marijuana and was suspended for 30 days at which time he was again tested. Once more he tested positive for marijuana and was again suspended for 30 days and then retested. At this third test, 60 days following the accident, he tested negative for drug use. He was then reinstated and agreed to random testing for three years. Then two months later at a regularly scheduled bi-annual physical examination his urine again tested positive for marijuana, and he was discharged.

## II

The defendant moves for summary judgment on the basis that there is no genuine issue as to any material fact with respect to plaintiff's claim that GCRTA acted unreasonably, within the meaning of the Fourth Amendment; 1) in requiring plaintiff to take a drug test following his collision with the rear of another vehicle, 2) in subsequently testing for drugs after initially testing positive, and 3) in routinely testing for drugs at his bi-annual physical. Defendant further states that plaintiff cannot produce evidence which could convince a reasonable trier of fact that the GCRTA deprived him of his right to be free from unreasonable searches and therefore defen-

---

**5.** ... [I]t is my decision to reduce the discharge to a 30 day suspension, after which he must report to the company doctor ..., for a follow-up sobriety test[:]

    1. If the test results are negative, ... he will be reinstated *subject to random testing for the next three years* and detection of a non-prescription drug will result in his immediate discharge.

    2. If the test results are positive, he will remain under suspension for an additional ... (30) days after which time he will be retested....

Discharge Appeal of Operator Anthony Holloman—(Defense Exhibit # 12) (emphasis added).

dant is entitled to judgment as a matter of law.

In order to survive a motion for summary judgment, the nonmoving party, in this case plaintiff, must submit evidence to demonstrate the existence of a genuine issue of material fact as to each element of his claim. As the United States Supreme Court stated in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cert denied* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* 477 U.S. at 322, 106 S.Ct. at 2552.

The purpose of summary judgment is to assess the proof and determine whether there is a genuine reason for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Even in cases involving questions of motive or intent, the court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

Summary judgment is proper unless the record contains sufficient evidence favoring the nonmoving party to enable a reasonable jury to return a verdict for that party. *Id.* at 248–50, 106 S.Ct. at 2510–2511 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted).

The moving party need only show the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. at 2554. The nonmoving party must go beyond the pleadings and present specific facts demonstrating that there is a genuine

issue for trial and "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Stated another way, the nonmoving party must show triable issues as to all the elements of his claim.

When a nonmoving party fails to place sufficient evidence in the record:

> ... there can be 'no issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552.

In the instant case the material facts regarding plaintiff's constitutional claims are not in dispute. It is undisputed; 1) that the GCRTA has a written Drug Policy which requires its bus drivers to submit to blood and urine testing following their involvement in a rear-end collision with another vehicle and/or during their bi-annual physical examination, 2) that the Drug Policy grants the GCRTA discretion to either discharge an employee who initially tests positive for marijuana or, in the alternative, to conditionally reinstate the employee subject to follow-up testing and, 3) that the bus driven by plaintiff was involved in a rear-end collision with another vehicle, after which he was required to provide blood and urine samples.

Thus, this case turns upon the legal question of whether or not the GCRTA's policy of; 1) requiring bus drivers involved in rear-end collisions to take drug tests, 2) to submit to subsequent drug testing after initial positive test results, and 3) to submit to drug testing at bi-annual physical examinations is reasonable in the absence of reasonable individualized suspicion that the

particular employee is impaired.[6]

## III

Drug abuse is one of the most significant problems affecting the United States today. The Third Circuit Court of Appeals has noted that:

> ... the enormity of the problem facing this country because of drug use is sufficiently well established to justify judicial notice.

*Transport Workers' Union, Local 234 v. SEPTA,* 863 F.2d 1110, 1119 (3d Cir.1988), *vacated,* —— U.S. ——, 109 S.Ct. 3208, 106 L.Ed.2d 560 *reaffirmed,* 884 F.2d 709 (3d Cir.1989).

The effects of drug abuse have not been limited to the social context, but have also been manifest in the workplace, with devasting human and financial loss and as such, are cause for concern and careful examination. *See* 49 Fed.Reg. at 24253–24254 (Federal Railroad Administration ("F.R.A.") identifies 66 injuries and $28 million in property damage resulting from drug and alcohol-impaired employees in an eight-year period in the railroad industry).

In response to this ominous problem of drug abuse in the work place and to the Federal Government's war on drugs, many public employers have been required to utilize drug testing pursuant to Federal regulation. *See e.g.* 49 C.F.R. Part 40 (1988) (U.S. Department of Transportation mandates comprehensive employee drug testing, including random testing, under its six operating administrations).

Recently, the U.S. Supreme Court granted certiorari and announced its decisions in two cases which squarely present the issue of whether or not the Fourth Amendment requires a public employer to have individual, reasonable suspicion before requiring its employees to take a drug test. *See Skin-*

*ner v. Railway Labor Executives Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

In *Skinner,* the Court held that drug testing conducted pursuant to Federal Railroad Administration Regulations ("F.R.A.") which required mandatory drug testing of train crews following certain accidents was reasonable within the meaning of the Fourth Amendment even though the testing was conducted in the absence of reasonable suspicion that a particular employee might be impaired. The Court's landmark holding provides cogent guidance in addressing the constitutionality of public sector employee drug testing.

In determining the constitutionality of the F.R.A. regulations, the Court in *Skinner* initially acknowledged that the collection and testing of blood and urine specimens constituted a search under the Fourth Amendment, and as such, the reasonableness of the drug and alcohol testing was subject to traditional Fourth Amendment analysis. *Id.* at ——, 109 S.Ct. at 1412, 1413, 1414, 103 L.Ed.2d at 659, 660, 661.

The Court determined that the Fourth Amendment did not require a pre-test warrant given that; 1) the regulations provide for little discretion in determining who to test, 2) the testing is conducted for administrative as opposed to criminal purposes, and 3) adding a warrant requirement would add little to the certainty and regularity of the process. *Skinner,* 109 S.Ct. at 1416, 103 L.Ed.2d at 663–664. In so ruling, the Court noted that insistence upon a pre-test warrant would impede the government's purpose behind the search (detecting drug use), given that the delay might result in the destruction of valuable evidence.[7]

---

**6.** The question before this Court is not the constitutionality of the GCRTA's entire Drug Policy, but to particular provisions therein. Therefore, this decision is based on the particular facts and circumstances in the case before us as they relate to the constitutionality of those particular provisions contested.

**7.** Although the metabolites of some drugs remain in the urine for longer periods of time and may enable the Agency to estimate whether the employee was impaired by those drugs at the time of the covered accident, ... the delay necessary to procure a warrant ... may result in the destruction of valuable evidence. *Skinner* at ——, 109 S.Ct. at 1416, 103 L.Ed.2d at 664.

The Court noted that, to be reasonable, a search performed without a warrant "must be based, as a general matter, on probable cause to believe that the person to be searched has violated the law" or based on "some quantum of individualized suspicion", but emphasized that a showing of "individualized suspicion [was] not a constitutional floor below which a search must be presumed unreasonable." *Skinner,* at ——, 109 S.Ct. at 1416, 103 L.Ed.2d at 664 (*citing New Jersey v. T.L.O.,* 469 U.S. 325 at 340, 105 S.Ct. 733 at 742, 83 L.Ed.2d 720 (1985) and *United States v. Martinez–Fuerte,* 428 U.S. 543 at 560, 96 S.Ct. 3074 at 3084, 49 L.Ed.2d 1116 (1976)). The Court acknowledged that:

> ... [W]here the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, *a search may be reasonable despite the absence of such suspicion.*

*Skinner* at ——, 109 S.Ct. at 1417, 103 L.Ed.2d at 664 (*citing United States v. Martinez–Fuerte,* 428 U.S. 543 at 560, 96 S.Ct. 3074 at 3084) (emphasis added).

Under this analysis, the reasonableness of a given search "depends on all the circumstances surrounding the search ..., and the nature of the search itself." *Id.* —— U.S. at ——, 109 S.Ct. at 1414, 103 L.Ed.2d at 661 (*quoting United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985)). Accordingly, in making a judgment on whether a search is reasonable under the Fourth Amendment, the search in question "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.,* —— U.S. at ——, 109 S.Ct. at 1414, 103 L.Ed.2d at 661 (*quoting Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)).

The Court found that the employees covered by the F.R.A. regulations had a diminished expectation of privacy, as the railroad industry is pervasively regulated to ensure employee's fitness for duty. (Most railroads require periodic physical examination of employeees involved in the operation of railroad locomotives in order to ensure their health and fitness.)

The Court then assessed the effect of the F.R.A. regulations on the privacy interests of the tested employees, observing that the "intrusions on privacy under the F.R.A. regulations are limited" in that the samples (blood, urine, and breath) were collected in a medical environment, and that the provision of the samples was "not unlike simililar procedures encountered in the context of a regular physical examination." *Id.* —— U.S. at —— and ——, 109 S.Ct. at 1416 and 1417, 103 L.Ed.2d at 664 and 665.

The Court emphasized that the privacy interests of people employed in a regulated industry are not always to be considered minimal, and that some of the privacy interests implicated by the toxicological testing at issue might be viewed as significant in other contexts. But on the facts before it the Court stated that:

> ... logic and history show that a diminished expectation of privacy attaches to information relating to the physical condition of *covered* employees and to this *reasonable* means of procuring such information."

*Skinner* at ——, 109 S.Ct. at 1419, 103 L.Ed.2d at 667.

The Court then considered the government's interest in testing without a showing of reasonable suspicion and found that the interest was "compelling,":

> Employees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.... [E]mployees who are subject to testing under the F.R.A. regulations can cause great human loss before any signs of impairment become noticeable to supervisors or others. An impaired employee ... will seldom display any outward "signs detectable by the lay person or in many cases, even the physician." 50 Fed.Reg. 31526 (1985)....

*Id.* at ——, 109 S.Ct. at 1419, 103 L.Ed.2d at 667 (footnotes omitted).

As the government's goal in toxicological testing is designed not just to detect impairment, but also to deter drug use, the Court found that post-accident testing was reasonably related to its goals. The Court determined that by informing employees that they would be tested "upon the occurrence of a trigering event, the timing of which no employee can predict with certainty," provided an effective means of deterring them from using drugs or alcohol. The Court reasoned that the employment sanction of discharge for drug or alcohol use would not serve as an effective deterrent unless offenders were aware of potential discovery. But even if the tests disclosed nothing more than recent use of a controlled substance, that information would be relevant to a determination of the employee's fitness. *Id.* at ——, 109 S.Ct. at 1419-20, 103 L.Ed.2d at 668.

Accordingly, the Court held that the required employee drug testing under F.R.A. regulations was reasonable under the Fourth Amendment in the absence of reasonable suspicion that the tested employees were impaired as the Government's compelling interests outweighed the railroad employees' reduced expectation of privacy:

> ... [T]he compelling government interests served by the F.R.A.'s regulations would be significantly hindered if railroads were required to point to specific facts giving rise to a reasonable suspicion of impairment before testing a given employee.... [And that based] on the present record, the toxicological testing contemplated by the regulations is not an undue infringement on the justifiable expectations of privacy of [the] covered employees....

*Id.* at ——, 109 S.Ct. at 1421, 103 L.Ed.2d at 670 (emphasis added).

On the same day it announced its decision in *Skinner,* the Supreme Court also announced its decision in *National Treasury Employees Union v. Von Raab,* 489 U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). In that case, the Court upheld the constitutionality of the United States Customs Service's policy of requiring drug testing of all employees of the Service

seeking transfer or promotion to positions having a direct involvement in drug interdiction or involving the carrying of a firearm. Using the same analysis that it employed in *Skinner,* in *Von Raab,* the Court initially determined that neither a warrant nor a showing of probable cause was required as the testing program at issue was used for administrative purposes, not for a criminal investigation. *Id.* at ——, 109 S.Ct. at 1390, 1391, 103 L.Ed.2d at 702, 703. The Court also observed that the employees subject to testing knew the circumstances under which tests would be conducted. *Id.* at ——, 109 S.Ct. at 1391-1392, 103 L.Ed.2d at 703.

Focusing on whether this testing required individualized reasonable supicision, the Court found that the government had a compelling interest in ensuring that Customs Service personnel on the "front-lines" of drug interdiction on the nation's borders were drug-free. *Id.* at ——, 109 S.Ct. at 1392, 103 L.Ed.2d at 704. The Court also found that the Service had a compelling interest in detecting drug users among its personnel who are required to carry firearms, as such employees could cause loss of human life from even a momentary lapse of judgment. *Id.* at ——, 109 S.Ct. at 1393, 103 L.Ed.2d at 705.

In weighing the governmental interest against the effect on the individual employee's expectations of privacy, the Court recognized that certain forms of public employment necessarily involve a diminished expectation of privacy with respect to personal searches. *Id.* *See also O'Connor v. Ortega,* 480 U.S. 709, 717, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987). In this regard, the Court found that Customs employees who carry firearms or who are involved in drug interdiction would reasonably expect an inquiry into their fitness and probity and therefore, have a diminished expectation of privacy. *Von Raab,* —— U.S. at ——, 109 S.Ct. at 1393-1394, 103 L.Ed.2d at 706.

The Court also found the testing procedures to be minimally intrusive as the employees knew they would be subjected to testing, as the policy enunciated the cir-

cumstances under which testing would be required, and the testing procedure utilized was highly accurate.[8]

Based on these findings, the Court concluded that the compelling safety and national security interests advanced by the drug testing policy outweighed the employees' diminished privacy expectations.

■ Based on the foregoing discussion, the determination of whether a given drug test requires individual reasonable suspicion will require a balancing of the governmental interest in conducting the search against the individual privacy interest implicated by the search. *Skinner v. Railway Labor Executives Ass'n, supra; National Treasury Employees v. Von Raab, supra.*

■ Thus, after balancing the intrusiveness of the drug testing on the plaintiff's Fourth Amendment right to be free from unreasonable searches by the GCRTA against the GCRTA's interest in testing its drivers following the driver's involvement in a rear-end collision or/and at a bi-annual physical, this Court finds that GCRTA's testing of plaintiff in the instant case survives Fourth Amendment scrutiny as dictated by the Supreme Court analyses in *Skinner* and *Von Raab.*

### IV

A typical GCRTA bus is 40 feet long, 8½ feet wide, 10 feet high, weighs 13 tons and can accomodate between 44–55 passengers. These buses carry approximately 240,000 persons daily. Bus drivers have the responsibility of safely driving public passengers in these busses through the streets of Greater Cleveland, and just as the train crews in *Skinner* and the armed Customs Service agents in *Von Raab*, these drivers "discharge duties frought with such risks of injury to others than even a momentary lapse of attention can have disastrous consequences." *See Skinner v. Railway Labor Executives Ass'n, supra; National*

*Treasury Employees Union v. Von Raab, supra.*

The GCRTA's post-accident testing policy, like the F.R.A. regulations challenged in *Skinner*, is designed to deter employees, such as plaintiff in the instant case, who are engaged in safety-sensitive tasks from using drugs such as marijuana in the first place. The GCRTA has an obligation to insure that its bus dirvers are not impaired by the effects of drugs or alcohol while on the job. In addition, the Policy is also designed to detect chronic abusers of drugs and alcohol as there is concern that an employee who engages in drug/alcohol abuse "on his own time" may very well jeopardize the lives of passengers as a consequence of-duty activity. Plaintiff, Holloman, was aware of the GCRTA's policy of testing drivers after certain defined accidents. As noted by the Supreme Court in *Skinner*, where employees are aware that they may be tested upon a triggering event (such as an accident), the timing of which cannot be predicted with any certainty, it follows that the policy will have a deterrent effect.

In *Transport Workers' Union, Local 234 v. SEPTA*, 863 F.2d 1110, 1120 (3d Cir.1988), the Third Circuit Court of Appeals, in sustaining the random testing of a transit authority's bus drivers, relied in part upon expert medical testimony that the acute effects of marijuana include "distorting of judgment and loss of good judgment, a decrease in alertness and caution, impairment of visual, auditory and space perception, and loss of propriety of responses, such as ability to steer." The court also relied upon expert testimony that the "residual impairment effects" of marijuana use, such as "irritability, agitation, lack of alertness and awareness and memory deficits," may affect performance as long as twelve hours after use.

In light of the physiological carry-over effects of drug use, the GCRTA's policy of testing drivers involved in rear-end collisions could detect chronic drug users, thus

---

**8.** The Custom Service testing program must conform to the United States Department of Health and Human Services (HHS) regulations promul-

gated in accordance with the recently enacted federal statute (PL 100–71, § 503, 5 U.S.C.S. 7301 note).

furthering GCRTA's goal of detecting drug use by employees in safety-sensitive positions. *See also* Yesavage, Leirer, Denari and Hollister, *Carry–Over Effects of Marijuana Intoxication on Aircraft Pilot Performance: A Preliminary Report,* (American Journal of Psychiatry, November 1985 (Vol. 142, No. 11, P. 1325) (Study of effect of marijuana use on licensed pilots 24 hours after use concluded that mean performance "trends toward impairment" on all variables tested, with "significant impairment" shown in the performance of certain tasks.)

From the facts presented it is evident that GCRTA bus drivers, like the railroad train crews in *Skinner* and the Customs agents in *Von Raab,* have a diminished expectation of privacy by virtue of their employment framework designed to monitor employees' fitness for duty. As an example, GCRTA bus drivers, like most railroad employees, are required to take regularly scheduled physical examination which include eye exams and the provision of a urine specimen. Plaintiff acknowledged submitting to these examinations over the years. Also, GCRTA bus drivers can be barred from operating a vehicle when their health involves a possible safety risk, such as high blood pressure, being overweight, or using prescriptive medication. Drivers are also subjected to detailed reporting requirements and strict disciplinary procedures whenever they are involved in an accident. In addition, bus drivers generally, and plaintiff in particular, was aware that they would be required to submit to a drug and alcohol test during a regularly scheduled physical or after certain accidents. Drug testing at the time of these bi-annual physicals is just another test which may reveal another safety risk; it is no more intrusive.

In the instant case, as in *Skinner* and *Von Raab,* the testing procedures minimize the intrusiveness of the sample collection. Plaintiff provided his initial blood and urine samples in a medical-type environment. Each of his subsequent urine samples was given in the confines of a physician's office. The collection procedure was administered by trained medical personnel and plaintiff

was given privacy while providing each of the urine samples.

Based on the foregoing facts, this Court finds that: (1) GCRTA has a compelling interest in deterring and/or detecting drug and/or alcohol use by employees in safety-sensitive positions; (2) by virtue of the special physical demands of these safety sensitive positions, these employees have a diminished expectation of privacy as to the intrusions occasioned by such body-fluid testing; (3) the policy of testing drivers involved in rear-end collisions and at the bi-annual physical was known to the instant plaintiff; (4) the procurement procedures used in the sample collection are reasonable as they afford privacy in the production of the required specimen; (5) the sample testing is limited and reasonable in its scope; (6) the prescribed testing procedures are not arbitrary and are used for an administrative and not criminal purpose; and (7) the testing in the instant case bears a close and substantial relationship to GCRTA's goals of deterrence and/or detection of drug and/or alcohol use.

Therefore, this Court finds that the body-fluid testing required in the instant case was reasonable under the Federal Constitution's Fourth Amendment, notwithstanding the absence of probable cause or some level of individualized suspicion.

It is anticipated that this case and cases like *Skinner,* etc., are the forerunners of more cases to come in regard to drug testing without a "search warrant', probable cause", or "reasonable, individualized suspicion." There has been movement away from these traditional requirements when finding a search and seizure reasonable under the Fourth Amendment to the Constitution in the context of employee-drug testing.

The effects of drug and alcohol use has spread from a social context, affecting private lives, to the workplace where due to the nature of employment in safety-sensitive areas, these effects are endangering the public. This problem has and will continue to affect the analyses of laws pertain-

ing to employee-testing for drug and/or alcohol use.

Thus, an individual's right to privacy in the workplace where drug and/or alcohol use may pose harm and/or danger to the public due to the nature of employment, is now in the process of modification. Legal scholars and "strict constructionists" who believe that any interpretation of the Constitution should adhere to an "original intent" analyses will not be happy with this modification.

Rather than an absolute right to privacy and the mandate of a "search warrant", "probable cause" or "individualized suspicion" before allowing drug testing, we are now talking about an "expectation of privacy" balanced by the public good or public interest.

Historically, the courts have judged the reasonableness of a Fourth Amendment search of an individual on the "probability" of "wrong doing" by that individual or by recognizing the danger posed to policemen under certain circumstances and allowing a "limited" search to reduce the danger posed. But, "the probable cause standard " 'is peculiarly related to criminal investigations.' " and may not be helpful when analyzing the reasonableness of routine administrative functions designed to prevent potentially catastrophic events. *Von Raab,* —— U.S. at ——, 109 S.Ct. at 1391–1392, 103 L.Ed.2d at 703, citing *Camara v. Municipal Court,* 387 U.S. 523 at 535–536, 87 S.Ct. 1727 at 1734–1735, 18 L.Ed.2d 930 (1967) (noting that building code inspections, unlike criminal investigation searches, are designed "to prevent even the unintentional development of conditions which are hazardous to public health and safety".) Today, we do no more than that.

We are on the cutting edge of new law. We can anticipate that government agencies will be instituting drug testing policies which will include random testing and testing as part of required physical examinations. Questions presented would be the efect of these policies on new and existing employees in situations where the policy was already embodied in an existing collective bargaining agreement or in situations where no agreement was in effect.

Other questions will be whether positions selected for testing are defined more broadly than necessary to meet the purposes of the proposed testing program: when justifying warrantless searches, without probable cause or individualized reasonable suspicion, the courts must first decide whether the search was reasonable at its inception and must consider the nature of the employment and the type of equipment involved.

These are some of the issues which will have to be decided. Legal scholars and attorneys need to direct their attention to these yet unadressed issues.

In the instant case the GCRTA, a government agency, has presented evidence which has demonstrated the reasonableness of its drug testing policy and its compelling interest in the safety of a substantial portion of Greater Cleveland's population.

In recognizing the GCRTA's legitimate compelling interest in protecting the safety of its ridership by detecting and deterring drug use among its bus drivers, the diminished expectation of privacy concerning "fitness information" by such employees, and the limited intrusiveness of the testing this Court finds that GCRTA's drug policy is reasonable and did not violate plaintiff's constitutional rights as a matter of law.

In reaching our result today, this court does not ignore the text and doctrine of the Fourth Amendment, requiring that "intrusive searches" be reasonable. We have not dispensed with that constitutional requirement. "Unfortunately, there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court,* 387 U.S. 523, 537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930. We have in this decision made this balance to arrive at a finding of "reasonableness" when judging searches for administrative purposes.

Plaintiff's claim also alleges that GCRTA deprived him of due process of law. He is apparently asserting a claim of substantive

due process. This is completely unsupported with facts or law.

Accordingly, this Court shall grant the defendant's motion for summary judgment and shall enter judgment for the defendant and against the plaintiff.