Derrick A. WILEY, Petitioner,

v.

**DEPARTMENT OF JUSTICE,**
Respondent.

No. 02–3044.

United States Court of Appeals,
Federal Circuit.

DECIDED: May 12, 2003.

Ari H. Mendelson, Law Office of Martin J. Rivas, P.A., of Coral Gables, Florida, argued for petitioner. On the brief was Martin J. Rivas.

Phyllis Jo Baunach, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With her on the brief were David M. Cohen, Director, and Deborah A. Bynum, Assistant Director. Of counsel on the brief was Neal J. Swartz, Assistant General Counsel, Federal Bureau of Prison, Department of Justice, of Washington, DC. Of counsel was Natalie R.W. Holick, Federal Bureau of Prisons.

Before CLEVENGER, GAJARSA, and PROST, Circuit Judges.

Opinion for the Court filed by Circuit Judge GAJARSA. Dissenting opinion filed by Circuit Judge PROST.

GAJARSA, Circuit Judge.

Derrick A. Wiley ("Wiley") petitions for review of the final decision of the Merit Systems Protection Board ("Board") concluding that the search of Wiley's car conducted by Wiley's employer, the Federal Bureau of Prisons in the Department of Justice ("agency"), did not violate the Fourth Amendment, thereby sustaining Wiley's removal from the agency for refusing to submit initially to the search when requested. *Wiley v. Dep't of Justice,* 89 M.S.P.R. 542 (M.S.P.B.2001). We reverse the Board's determination because we conclude that the search of Wiley's car was unreasonable within the meaning of the Fourth Amendment.

## I. BACKGROUND

Wiley was employed by the agency as a teacher in a Miami, Florida, federal correc-

tional institution ("Institution"). In 1997, Wiley was investigated for allegedly bringing a weapon onto Institution grounds ("the 1997 investigation"). No weapon was found in that investigation. On November 29, 1999, William Patrick, the Warden of the Institution, received a memorandum from the agency's Office of Internal Affairs ("OIA") in Washington, D.C. In the memorandum, dated November 10, 1999, the OIA alerted the Institution to a matter raised by a certain Mr. Martin St. Jones, who alleged that although the FBI had not been able to prove the earlier allegation, Wiley continued to keep a gun in his car in the Institution parking lot. The OIA also attached a letter that was dated January 7, 1999, and signed by "a friend," allegedly Mr. Martin St. Jones.[1] The letter alleged that Wiley kept a loaded 9 mm weapon in his vehicle in the Institution's parking lot, that Wiley had bragged about having the gun, and that several unidentified correctional officers had seen the gun. In its entirety, the text of the letter reads as follows:

Dear sir,

I am writing to you because it seems very hypocritical that other officers in this place [Federal Correctional Institution] must abide by the rules and regulations and the overall institutional policy while one individual has been falunting [sic] the rules and the law by bringing in a loaded hundgun [sic] into the institution and be sheltered by the "Buddy Buddy System" while other officers must abide by the strictest of interpretations of regulations.

The individual in question had been seen having a loaded 9 mm weapon in the Education Department of the insti-

tution and the FBI was informed but because of the protective blanket thrown over him by the individuals who were in charge of the investigation nothing ever happened. Well it would seem that having learned the lesson this particular individual would never attempt to bring the weapon near the Federal Institution. Well, that would be erroneous since this Corrections Officer, in complete defiance of the law, has continued to laugh at all of us and the inmates by being above the law and he not only brings the weapon here but he boasts to others, including inmates, that as a corrections officer he is allowed to bring the weapon to this institution.

The weapon is always, now, being kept in the automobile in the general parking lot and this has been seen by other officers.

I am refering [sic] to officer WYLEY [sic] who works evenings in the Education Department.

SINCERELY,

a friend

The OIA referred the matter to the Warden "for appropriate local investigation." The Warden testified that on November 29, 1999, through Special Investigative Agent ("SIA") Archie Longley, the Warden confirmed with the OIA that its letter referred to a new allegation and not the prior 1997 investigation. That same day, the Warden ordered SIA Longley to search Wiley's vehicle.

On December 1, 1999, SIA Longley called Wiley to his office and requested a search of Wiley's car. Wiley initially refused, left the Institution building, got into his car, and drove away. He returned

---

**1.** The name Mr. Martin St. Jones eventually was shown to be fictitious.

about twenty to thirty-five minutes later and consented to the search. SIA Longley then searched Wiley's vehicle in the parking lot of the agency, but no gun was found. On February 3, 2000, the agency notified Wiley of his removal from employment, effective the same day, based on the charge of "refusing to submit to a search when initially instructed."

Wiley appealed his removal to the Board. On July 13, 2000, an administrative judge ("AJ") sustained Wiley's removal in an initial decision, finding that the agency was able to prove the charge of refusing to submit to a search when initially instructed. The AJ rejected Wiley's arguments that the search violated the Fourth Amendment's prohibition on unreasonable searches and that the search was taken in reprisal for a prior Board appeal that same year regarding a proposal to remove Wiley.[2] Wiley petitioned for review of the AJ's decision to the full Board.

On September 4, 2001, the Board granted Wiley's petition, but sustained his removal, concluding that the search of his vehicle did not violate the Fourth Amendment. The Board first determined that the Fourth Amendment was implicated by the search as Wiley had a reasonable expectation of privacy in the contents of his car. The Board next determined that the case fell under *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), in which the Supreme Court held that a public employer must show only reasonable suspicion and not probable cause to justify Fourth Amendment searches undertaken in the workplace for noninvestigatory work-related purposes or for evidence of misconduct. The Board concluded that the agency established that

the Warden had reasonable suspicion to search Wiley's car based on the information available to the Warden at the time he ordered the search. The Board found no error by the AJ in all other regards, including the AJ's treatment of the charge itself, the reprisal defense, and various alleged procedural deficiencies in the proceeding before the AJ. Wiley timely appealed the Board decision, and this court has jurisdiction over the case pursuant to 28 U.S.C. § 1295(a)(9).

## II. DISCUSSION

The Supreme Court has instructed that the ultimate question of reasonable suspicion and probable cause to make a warrantless Fourth Amendment search generally should be reviewed *de novo*, with the underlying findings of fact and drawn inferences reviewed under the appropriate deferential standard. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). This court will overturn a Board decision if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without adherence to procedures required by law, rule, or regulation; or unsupported by substantial evidence. 5 U.S.C. § 7703(c) (2000).

Wiley does not dispute that the agency was able to prove the stated charge of failure to submit to the search when initially requested. Rather, Wiley attacks his removal by contending that the search to which he initially refused to submit was unconstitutional. Specifically, Wiley argues that (1) the Supreme Court's *Ortega* decision and its attendant reasonable suspicion standard are inapplicable, and

2. The prior Board appeal, which is unrelated to the current appeal, was settled while pending at the Board, and Wiley's termination was reduced to a thirty-day suspension.

therefore the Board should have required the agency to prove that the Warden had probable cause to search his car, and (2) even assuming that reasonable suspicion is the applicable standard, the Board erred in finding that the Warden had the requisite reasonable suspicion to justify the search.

## A. Fourth Amendment Standard

We disagree with Wiley that the Warden was required to have probable cause to conduct a lawful search of Wiley's vehicle. Wiley was employed as a teacher at the Institution while his car was parked in a restricted area within the confines of the Institution. This case falls squarely under the *Ortega* decision and thus should be analyzed under the reasonable suspicion standard.

The Fourth Amendment prohibits the government from undertaking "unreasonable searches and seizures" of individuals and their property. U.S. Const. amend. IV. Ordinarily, a Fourth Amendment search must be supported by probable cause. *See New Jersey v. TLO,* 469 U.S. 325, 340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). The fundamental precept of the Fourth Amendment, however, is that a search must be *reasonable,* and although "both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required." *Id.* (quoting *Almeida–Sanchez v. United States,* 413 U.S. 266, 277, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (Powell, J., concurring)). Ultimately, the determination of the standard of reasonableness governing any specific class of searches requires balancing the "individual's legitimate expectations of privacy and personal security" with the "government's need for effective methods to deal with breaches of public order." *Id.* at 337, 105 S.Ct. 733. Indeed, the Supreme Court has stated that where "a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard." *Id.* at 341, 105 S.Ct. 733.

### 1. Ortega

In *Ortega,* the Supreme Court defined such a category of searches. There, the Court addressed the appropriate Fourth Amendment standard for a search of a public employee's office by a public employer in areas in which the employee had a reasonable expectation of privacy. *Ortega,* 480 U.S. 709, 107 S.Ct. 1492. The Court recognized that public employees have legitimate privacy interests in the private objects they bring to the workplace. *Id.* at 721, 107 S.Ct. 1492. However, requiring a government employer in these instances to obtain a warrant would impede the "efficient and proper operation of the workplace." *Id.* at 723, 107 S.Ct. 1492. The government's interest in the "efficient and proper operation of the workplace," *id.,* persuaded the court that on balance, despite the intrusion on individuals' privacy, a probable cause requirement "would impose intolerable burdens on public employers." *Id.* at 724, 107 S.Ct. 1492. The Court therefore held that, at least with regard to workplace searches by a public employer of a government employee where the search is either for "noninvestigatory, work-related purposes" or "investigations of work-related misconduct," the government need only demonstrate "reasonableness under all the circumstances" to justify the constitutionality of the search. *Id.* at 725–26, 107 S.Ct.

1492. This reasonableness inquiry in turn encompasses two inquiries: (1) whether the "action was justified at its inception," i.e., whether there were *"reasonable grounds for suspecting* that the search will turn up evidence that the employee is guilty of work-related misconduct," *id.* at 726, 107 S.Ct. 1492 (emphasis added) (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); and (2) whether the search as actually conducted was "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 726, 107 S.Ct. 1492 (quoting *TLO,* 469 U.S. at 341, 105 S.Ct. 733).

### a. "Workplace"

■ In holding that workplace searches undertaken either for noninvestigatory work-related purposes or to investigate work-related misconduct may be predicated on reasonable suspicion rather than probable cause, the Court in *Ortega* defined the "workplace" as "those areas ... that are related to work and are generally within the employer's control." 480 U.S. at 715, 107 S.Ct. 1492. As an example, at a hospital, the hallways, cafeteria, offices, desks, and file cabinets, among other areas, are part of the workplace. *Id.* at 715–16, 107 S.Ct. 1492. However, personal possessions on workplace territory, such as closed personal luggage or a handbag, would not necessarily be considered part of the workplace context. *Id.* at 716, 107 S.Ct. 1492.

■ Wiley contends that *Ortega* is inapplicable to this case because his car was like a closed briefcase or suitcase that under *Ortega* might not be in the workplace. We disagree. Wiley's car was parked in the Institution's parking lot, which was on agency property, adjacent to the Institution, and available to accommodate employees and visitors of the Institution. The agency maintained control over the parking lot, as evidenced by the notice posted at the entrance of the parking lot advising visitors and employees that "[a]ll persons entering upon these premises are subject to routine searches of their person, property *(including vehicles)*, and packages" (emphasis added). Unlike a situation in which a public employee brings a closed suitcase to work without any expectation that it would be searched, Wiley was on notice that his car could be searched. Therefore, Wiley's car, as situated in the Institution's parking lot, was within the "workplace" as set forth in *Ortega.*

### b. Work–Related Misconduct

The *Ortega* Court also limited its holding to searches undertaken (1) for noninvestigatory work-related purposes or (2) to investigate work-related misconduct. *Id.* at 725–26, 107 S.Ct. 1492. The Court distinguished these sorts of searches from those searches seeking to find evidence of criminal misconduct, *id.* at 721, 107 S.Ct. 1492, reasoning that public employers "are hardly in the business of investigating the violation of criminal laws." *Id.* at 722, 107 S.Ct. 1492. The Court expressly declined to address the appropriate Fourth Amendment standard "when an employee is being investigated for *criminal* misconduct or breaches of other nonwork-related statutory or regulatory standards." *Id.* at 729 n. *, 107 S.Ct. 1492 (emphasis added); *see also Cerrone v. Brown,* 246 F.3d 194, 201 (2d Cir.2001) ("[*Ortega*] did not disturb the well-settled rule that probable cause is required for criminal investigations.").

■ Wiley argues that, in contrast to the search in *Ortega,* the search conducted by the Warden in this case was not an

investigation simply to unearth evidence of work-related misconduct, but one with possible criminal implications requiring the existence of probable cause to sustain the search's legality. Wiley alleges that the correctional officers who conducted the search could have arrested him. However, in looking to ascertain whether the investigation is criminal in nature, the proper focus is not on the positions or capabilities of the persons conducting the search, but rather the reason for the search itself. *See United States v. Fernandes,* 272 F.3d 938, 943 n. 3 (7th Cir.2001) (analyzing the case pursuant to *Ortega* because, while the prosecutor ordering the search of Fernandes's office was "in the business of investigating the violation of . . . criminal laws," the search itself was not a criminal investigation, but rather undertaken to "ensure that the work of the agency [was] conducted in a proper and efficient manner" (quoting *Ortega,* 480 U.S. at 723, 724, 107 S.Ct. 1492)). Wiley argues that he could have been arrested pursuant to 18 U.S.C. § 1791, which provides for fines or imprisonment for providing or attempting to provide prohibited objects, including firearms, to a prison inmate. However, Wiley does not provide any evidence to indicate that the Warden ordered the search in view of § 1791.

Rather, the facts of this case indicate that the search of Wiley's car was an internal investigation for purposes of maintaining security and order in the Institution. The Bureau of Prison's "Standards of Employee Conduct," Program Statement 3420.08, prohibits employees at the Institution from introducing "contraband into or upon the grounds of any federal penal or correctional institution, or taking or attempting to take therefrom, anything whatsoever without the Warden's knowledge and consent. . . ." The initial impetus for the search was the OIA memorandum, which requested that the Warden investigate the matter locally and forward a report of his findings to the OIA in Denver. The memorandum also informed the Warden that upon receipt of his report, the matter would be "considered closed" unless the Warden was requested to provide additional information. The memorandum thus signals that the purpose of the search of Wiley's car was not to ferret out possible criminal activity but to uncover work-related misconduct in an internal investigation by the agency.

In conclusion, because the search of Wiley's car was a workplace search undertaken to investigate possible work-related misconduct, we agree with the Board that the search should be analyzed pursuant to the reasonable suspicion standard articulated in the *Ortega* decision.

### 2. Balancing Test

 Moreover, the prison context in this case raises special considerations that persuade us that the search only need be supported by reasonable suspicion. The core requirement of the Fourth Amendment is reasonableness under all the circumstances. *See, e.g., Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Determining reasonableness of a particular search "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* (quoting *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). First, we examine Wiley's personal privacy interests as well as the nature of the intrusion on his privacy interests. The Board determined, and it is not disputed, that Wiley had a reasonable expectation of pri-

vacy in his car. However, Wiley's expectation of privacy was mitigated by the conspicuous sign posted at the entrance of the Institution parking lot indicating that his vehicle was subject to search. Additionally, the nature of the search of Wiley's vehicle was not as intrusive as other types of searches, such as body cavity searches, that have been upheld as reasonable in light of recognized government interests. *See Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). Next, we consider the "nature and immediacy of the governmental concern at issue." *Id.* at 660, 115. S.Ct. 2386. Here, the government's interest in controlling the entry of guns and other dangerous weapons into the Institution is readily appreciated. *See Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (A state's operation of a prison "presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."). Upon balancing the intrusion on Wiley's Fourth Amendment interests against the agency's substantial interest in maintaining the security of the Institution, we conclude that the agency needed only to demonstrate that the Warden had reasonable grounds to suspect that Wiley kept a gun in his vehicle parked in the Institution's lot.

*B. Sufficiency of the Evidence*

■ We now turn to the question of whether the Warden, at the time he ordered the search on November 29, 1999, had reasonable grounds to suspect that Wiley kept a gun in his car, based on the informant's letter that was forwarded from the OIA and which alleged that Wiley was keeping a 9 mm gun in his vehicle in the Institution parking lot ("the tip"). For the reasons below, we conclude that, as in

*Florida v. JL,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the tip in this case, standing alone, lacked the necessary indicia of reliability to serve as the basis for the search.

■ Probable cause and reasonable suspicion are "fluid concept[s]—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). That said, the Supreme Court has defined probable cause as "a fair probability" that the government action, e.g., search, will yield the evidence sought after. *Id.* at 238, 103 S.Ct. 2317. Reasonable suspicion, "a less demanding standard" than probable cause, may be established with information different in quantity and content and less reliable than that necessary for probable cause. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Where an informant's tip provides the basis for a search implicating the Fourth Amendment, we look to the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge, to determine the constitutionality of the search. *See Gates,* 462 U.S. at 230, 103 S.Ct. 2317 (modifying the two-pronged approach established by *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)). Although first articulated in a probable cause context, these factors are equally relevant to determining the value of the tip in a reasonable suspicion inquiry, although "allowance must be made in applying them for the lesser showing required to meet that standard." *White,* 496 U.S. at 328–29, 110 S.Ct. 2412. In determining whether a Fourth Amend-

ment search was supported by reasonable suspicion, we examine what information was available to the party ordering the search at the time the search was ordered. *Garrison v. Dep't of Justice,* 72 F.3d 1566, 1569 (Fed.Cir.1995).

An anonymous tip in particular raises special concerns as to how to establish the veracity, reliability, and basis of knowledge of the hearsay information alleged in the tip. Unlike a known informant, who can be held accountable if he or she provides inaccurate information and whose reputation can be assessed, *JL,* 529 U.S. at 270, 120 S.Ct. 1375, an anonymous tip "seldom demonstrates the informant's basis of knowledge or veracity inasmuch as . . . the veracity of persons supplying anonymous tips is 'by hypothesis largely unknown, and unknowable.'" *White,* 496 U.S. at 329, 110 S.Ct. 2412 (quoting *Gates,* 462 U.S. at 237, 103 S.Ct. 2317). Nonetheless, the Supreme Court has acknowledged that there are "situations in which an anonymous tip, *suitably corroborated,* exhibits 'sufficient indicia of reliability to provide reasonable suspicion'" to support the government investigation. *JL,* 529 U.S. at 270, 120 S.Ct. 1375 (emphasis added) (quoting *White,* 496 U.S. at 327, 110 S.Ct. 2412).

In *White,* the Court held that there was such sufficient corroboration of an anonymous tip to establish the necessary indicia of reliability to support a stop on reasonable suspicion. 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301. In *White,* the police received an anonymous tip that a woman named Vanessa White would be leaving a particular apartment at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of an ounce of cocaine housed inside a brown leather at-

taché case. 496 U.S. at 327, 110 S.Ct. 2412. The police subsequently observed the events pass as predicted by the tipster. At the point that the Plymouth pulled into the street where Dobey's Motel was located, the police stopped the car and searched it, finding cocaine in a brown attaché case. *Id.* The Court noted that the tip, standing alone, would be insufficient to establish reasonable suspicion of the alleged criminal activity. *Id.* at 329, 110 S.Ct. 2412. However, the tipster disclosed "future actions of third parties ordinarily not easily predicted." *Id.* at 332, 110 S.Ct. 2412 (quoting *Gates,* 462 U.S. at 245, 103 S.Ct. 2317). The fact that "significant aspects" of the tipster's predictions were corroborated by independent police investigation persuaded the Court that there existed sufficient indicia of reliability to justify the stop. *Id.* However, the Court acknowledged that this was a "close case." *Id.*

In *JL,* the Court noted that it had regarded the *White* case as "borderline." *JL,* 529 U.S. at 271, 120 S.Ct. 1375. In contrast, the *JL* Court characterized the instant case as "surely fall[ing] on the other side of the line," *id.,* holding that an anonymous tip lacked the indicia of reliability to establish reasonable suspicion that criminal activity was afoot. *Id.* at 274, 120 S.Ct. 1375. In *JL* the police received a tip from an anonymous caller that a young black male, standing at a particular bus stop and wearing a plaid shirt, was carrying a gun. *Id.* at 268, 120 S.Ct. 1375. The police arrived at the bus stop and saw a black male wearing a plaid shirt. *Id.* The police had no other reason apart from the tip for suspecting him of involvement in criminal activity. The police stopped and frisked the man, seizing a gun. *Id.* The Court concluded that the tip did not exhibit sufficient "indicia of reliability" to support a reasonable suspicion that the man

at the bus stop had a gun. *Id.* at 271, 120 S.Ct. 1375. The Court noted that whereas the tipster in *White* had accurately predicted the suspect's movements, the anonymous call in *JL* provided no predictive information. *Id.* In contrast to *White*, the anonymous informant in *JL* gave only a "bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the suspect]." *Id.*

Given this framework, we now examine the nature and sufficiency of the information before the Warden on November 29, 1999, when he ordered the search of Wiley's car. As in *White* and *JL*, we are dealing with an anonymous tip situation. The Warden admitted that he did not know and did not attempt to ascertain the identity of the tipster, the said Mr. Martin St. Jones, at the time he ordered the search. The Warden also testified that he was not aware whether the tipster previously was known to the OIA or had supplied reliable information in the past.

The Warden also was aware of the 1997 investigation regarding allegations that Wiley was carrying a gun into the Institution. However, the government at oral argument was unable to substantiate that the Warden had actual knowledge that Wiley previously had brought a gun onto Institution grounds. An FBI agent who interviewed Wiley during the 1997 investigation testified before the AJ that Wiley confessed to her that he may have carried a gun into the Institution by accident. The FBI agent further testified that

through SIA Longley she informed the Warden of the results of her interview with Wiley. In particular, she gave SIA Longley a copy of her report of the interview. The record does not indicate, however, that SIA Longley gave the report itself to the Warden or that the report itself included details as to Wiley's confession to the FBI agent. The Warden himself admitted that he was not privy to all the details of the prior investigation. On the facts before us, therefore, we can only assume that while the Warden knew of the 1997 investigation, the Warden did not have actual knowledge that Wiley previously ever had a gun on Institution grounds.

■ Thus, when the Warden ordered the search on November 29, 1999, all he had before him was a tip provided by an anonymous informant who gave Wiley's name and place of employment, and alleged that Wiley kept a 9 mm gun in his car and that several unidentified employees had seen the gun. As in *JL*, here we have a tip containing bare allegations that were not corroborated by anything outside the four corners of the tip itself.[3] The informant here furnished no explanation as to how he knew about the gun allegedly in Wiley's car or how he had any basis for believing the tipster had inside information. *See JL*, 529 U.S. at 271, 120 S.Ct. 1375. In this sense, this case is different from *White*, where the police independently corroborated, via direct observation, many significant details of the tip before stopping the suspect. *See White*, 496 U.S. at 332, 110 S.Ct. 2412. Furthermore, the

---

**3.** At pages 1357–1358 of the dissent, our colleague concludes that the tip was sufficiently reliable because the various allegations in the tip were "corroborated" by various statements in the tip itself. However, *White* and *JL* make clear that the allegations in an anonymous tip must be corroborated by sources *extrinsic* to the tip. Thus, the allegations in the tip cannot "corroborate" those very allegations themselves, and we therefore disagree with the dissent, which appears to suggest that this tautology is possible.

fact that the Warden was able to independently corroborate Wiley's name and place of employment does not establish the reliability of the tip as to the allegation that Wiley kept a gun in his car. Indeed, the Supreme Court specifically rejected this argument in *JL*, where the police were able to corroborate only the tip's assertion that there would a young black male wearing a plaid shirt at the bus stop, but did not substantiate the heart of the tip—that this male would be carrying a gun—before conducting a stop and frisk of a male of that physical description and location. Florida contended that the tip was reliable because police were able to corroborate the tip's description of the male's physical appearance, dress, and location. The Court disagreed:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of the concealed criminal activity. The reasonable suspicion here requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

529 U.S. at 272, 120 S.Ct. 1375. As in *JL*, the fact that here the Warden was able to corroborate "readily observable" allegations of the tip, i.e., Wiley's name and place of employment, does not establish the tip's reliability as to the allegation that Wiley carried a 9 mm gun. Moreover, the age of the tip calls into question its reliability. The informant's letter was dated January 7, 1999, and therefore almost eleven months old when relied upon by the Warden at the end of November 1999. The informant's letter gives no reason to

believe that Wiley would continue to keep a gun in his car on a long-term basis. For these reasons, we hold that the tip in this case lacked sufficient indicia of reliability to establish reasonable suspicion upon which to base the search of Wiley's car.

Such a tip lacking indicia of reliability could not itself provide the basis for an investigatory action without further investigation bolstering the constitutionality of the search. *See White*, 496 U.S. at 329, 110 S.Ct. 2412. Here, no such action was taken. Rather, the Warden admitted that the first step he took to investigate the reliability of the tip was to order the search of the car. Before the AJ, the Warden was asked whether he would "determine reliability before ordering a search...." The Warden replied:

> I think that was the purpose of the search, to determine the reliability. In this particular case we discussed a variety of ways how we could investigate or set up this investigation. It seemed like [the search] was the quickest and easiest way to determine whether this was a reliable charge, or whether [it was] a reliable comment, or whether it was not.

We disagree with the Warden's logic. The search may have been the "quickest and easiest way" of determining the reliability of the tip. However, the Warden's ordering of the search to determine the reliability of the tip essentially sidesteps the very issue presented in this case, i.e., whether the tip gave the Warden constitutional grounds to proceed with the search. Contrary to the Warden, we do not feel that convenience should trump constitutionality.

Finally, despite the unique concerns presented by the prison context in this case, this is not the sort of situation contemplated by the dicta in *JL*, where the Court

suggested that the usual showing of sufficient indicia of reliability might be relaxed in certain emergency situations:

> The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk.

*JL,* 529 U.S. at 273–74, 120 S.Ct. 1375. We are not persuaded that there was such an urgent situation here, given that it took over ten months for the OIA to act on the informant's letter and forward it to the Institution for investigation. We note that our analysis, which applies the reasonable suspicion rather than probable cause standard, *supra* Part II.A, has accounted for any special considerations present in the prison context, and, unlike our colleague in dissent, we decline to further diminish the level of constitutional protection afforded to Wiley in this case by using the prison context a second time to diminish the established tests of reliability for anonymous tips.

## III. CONCLUSION

For the foregoing reasons, we reverse the Board's sustaining of Wiley's removal for failure to submit to a search when initially requested because we conclude that the search violated the Fourth Amendment's requirement of reasonableness. We therefore do not reach the other issues raised on appeal, including Wiley's reprisal claim and procedural issues relating to the AJ's refusal to compel discovery and consider certain testimony.

*REVERSED.*

PROST, Circuit Judge, dissenting.

I agree with the majority's holding that the reasonable suspicion rather than probable cause standard applies in this case. I depart from the majority, however, with respect to its assessment of the credibility of the tip letter and in its ultimate application of the Fourth Amendment balancing test articulated in *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). In my view, as a prison employee who was on clear notice that his vehicle was subject to a search for weapons or contraband, Wiley's reasonable expectation of privacy was minimal. Therefore, in light of the government's paramount interest in controlling the prison environment, I would hold the tip here provided a sufficient basis for an employee's vehicle search on the specific facts of this case. Accordingly, I respectfully dissent.

### I

I begin with the majority's analysis of the sufficiency of the evidence contained in section II.B of its opinion. Without addressing the important specific information contained within the four-paragraph tip letter, the majority concludes that "the informant here furnished no explanation as to how he knew about the gun allegedly in Wiley's car or any basis for believing he had inside information." *See supra,* at 1355. Relying on *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), and *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), it states that a purely anonymous tip, entirely lacking in relevant corroboration, cannot provide the basis for reasonable suspicion. By contrasting *White,* in which the anonymous tipster "accurately predicted the suspect's movements" with *JL,* where "the anonymous call ... provided no predictive

information," *supra*, at 1355 (citation omitted), the majority concludes that "as in *Florida v. JL,* the tip in this case, standing alone, lacked the necessary indicia of reliability to serve as the basis for the search." *Id.* at 1353 (citation omitted).

I disagree. Unlike the case at bar, *White* and *JL* both dealt with the degree of credibility that an anonymous tip must have to provide the basis for a reasonable suspicion sufficient to justify a public "stop-and-frisk" (in *JL*) or a "*Terry* stop" (in *White*) by police officers seeking evidence of criminal activity by a member of the general public. In contrast, this case deals with the level of credibility needed to form a reasonable suspicion of employee misconduct necessary for a employer search on prison grounds of a prison employee's vehicle where that employee has clear notice that his vehicle was subject to search. As discussed in more detail below, I believe that these significantly different circumstances distinguish the degree of reliability necessary to establish reasonable suspicion in this case.

In my view, the tip at issue was sufficiently reliable to form the basis of the Warden's reasonable suspicion of employee misconduct. Contrary to the majority's assertion that "the informant here furnished no explanation as to how he knew about the gun allegedly in Wiley's car," *see supra*, at 1355, I read the four-paragraph tip letter as demonstrating that its author

had specific knowledge of various circumstances specific to, and occurring within, the prison. For example, the letter mentions the 1997 investigation of allegations that Wiley had brought a handgun into the prison and then goes on to allege that Wiley has continued to "boast" about his ability to do so. Clearly, the tip is not entirely devoid of corroborative information. While it is not predictive in nature, as was the case in *White*, the detailed letter shows that the informant obviously had "some familiarity with [Wiley's] affairs" as well as certain "inside knowledge" both about Wiley and what was going on in the prison. *JL*, 529 U.S. at 270–71, 120 S.Ct. 1375 (citations omitted). Because the tip letter evinces more than just the "tendency to identify a determinate person," given the particular context of this case, I believe the majority incorrectly concluded that the tip letter was insufficiently reliable under *JL* to justify the Warden's search of a prison employee's car.[1]

I also disagree with the majority's conclusion that the age of the letter containing the tip so substantially reduced its reliability that the "letter gives no reason to believe that Wiley would continue to keep a gun on a long-term basis." *See supra*, at 1356. On the contrary, the tip letter contains specific allegations of a long-term and ongoing pattern of Wiley's bringing a firearm onto prison property. For exam-

1. *See JL,* 529 U.S. at 272, 120 S.Ct. 1375. I disagree with the majority that *White* and *JL* make clear that "corroboration" must come only from extrinsic sources. As the Court stated in *White*, "[r]easonable suspicion, like probable cause, is dependent both on the content of the information possessed and its degree of reliability." Both factors—quantity and quality—are considered in the " 'totality of the circumstances—the whole picture.' " 496 U.S. at 330, 110 S.Ct. 2412 (citation omitted). As further explained in *JL*, the tip information in *White* was deemed sufficiently reliable because "[k]nowledge about a person's future movements indicates some familiarity with that person's affairs." 529 U.S. at 271, 120 S.Ct. 1375. At a minimum, the tip letter demonstrated that the tipster knew about the 1997 allegations and their disposition, thus indicating that the tipster had some "familiarity with [Wiley's] affairs." *Id.*

ple, after asserting that Wiley was "sheltered by the 'Buddy Buddy System,'" during the 1997 investigation, the letter goes on to state that Wiley "has continued to laugh at all of us and the inmates by being above the law and he not only brings the weapon here but he boasts to others, including inmates, that as a corrections officer he is allowed to bring the weapon to this institution." The letter further states that "[t]he weapon is always, now, kept in the automobile in the general parking lot." Thus, unlike the type of single, discrete incident of criminal behavior at issue in *White* and *JL*, the tip in this case alleges an ongoing pattern of behavior lasting at least from 1997 to 1999. Accordingly, I cannot agree with the majority's assertion that the tip letter "gives no reason to believe" that Wiley's behavior was "long-term" and, therefore, very possibly ongoing. *See supra*, at 1356. In this regard, it is also relevant that the Warden, upon receiving the Office of Internal Affairs ("OIA") memo and the attached 11-month-old tip letter,[2] instructed Special Investigative Agent Longley to confirm with the OIA that an investigation of Wiley was still necessary and that the tip letter did not relate to the previously-concluded 1997 investigation. The Warden testified that the OIA responded that this was a "current referral" that needed investigation. The Warden acted promptly upon receiving the OIA memo, ordering the search of Wiley's vehicle on the first day Wiley was at work after the OIA confirmation that further investigation was necessary. Thus, while I think the delay here makes this a close case, taking all these factors into account, I would conclude that the Warden acted reasonably in according

the tip letter sufficient credibility despite its age to justify a search of a prison employee's vehicle.

Further, the majority reasons that the fact that it took over ten months for the OIA to act on the informant's letter demonstrates that this case does not implicate the "sort of situation contemplated by the dicta in JL, where the Court suggested that the usual showing of sufficient indicia of reliability might be relaxed in certain emergency situations." *See supra*, at 1356–1357 (citing *JL*, 529 U.S. at 273–74, 120 S.Ct. 1375). I agree with the majority that the tip here is not like "a report of a person carrying a bomb" and does not implicate the urgency that underlies the exception referred to by the majority. *JL*, 529 U.S. at 273, 120 S.Ct. 1375. However, the Court in *JL* also suggested a second possible context in which the reasonable suspicion test might be relaxed when it clarified that it did not "hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports and schools, cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere." *Id.* at 274, 120 S.Ct. 1375 (citations omitted). Notably, in support of this second exception, the Court cites *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), a case in which the Court upheld the search of a 14-year-old student's purse for cigarettes. Thus, in my view, the Supreme Court in *JL* seemingly left the door open to the application of a lower burden in the prison context because prisons would appear to fall squarely into this second category of environments in which

---

**2.** During three of these months Wiley was not working at the prison due to a previous dis-

charge subsequently reduced to a suspension.

an individual's reasonable expectation of privacy is substantially diminished. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (holding that the security interests of penal institution sufficiently outweigh the privacy interests of the inmates to permit visual body cavity searches without establishing probable cause). Indeed, the circumstances here appear even more compelling because Wiley, as a prison employee, had a much lower expectation of privacy than a member of the general public. *See, e.g., Leverette v. Bell,* 247 F.3d 160, 168 (4th Cir. 2001) (holding relatively low standard appropriate for search of prison employee because employee's expectation of privacy was "diminished in light of the prison's manifest interest" in preventing the introduction of contraband).

## II

With respect to the application of the Fourth Amendment balancing test, it is well-established that "[a] determination of the standard of reasonableness applicable to a particular class of searches requires 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Ortega,* 480 U.S. at 719, 107 S.Ct. 1492 (citation omitted). Additionally, "we must balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control, and the efficient operation of the workplace." *Id.* at 720–21, 107 S.Ct. 1492.

In balancing these competing interests, I would find that Wiley, as a prison employee, had an extremely low expectation of privacy in his automobile while it was parked on prison property. Moreover, Wiley's already low expectation was further diminished by a conspicuous sign at the entrance to the parking lot that read in relevant part:

> It is a Federal crime to bring upon the institution grounds any firearm, destructive device, ammunition, other object designed to be used as a weapon ... without the knowledge and consent of the Warden.... All persons entering upon these premises are subject to routine searches of their person, property (including vehicles), and packages.

*Wiley v. Dep't of Justice,* 89 M.S.P.R. 542, 553 (2001) (Slavet, concurring).

Accordingly, balancing Wiley's exceptionally low expectation of privacy against the substantial governmental interest in prison security, and taking into account that the prison environment may fall within such "quarters where the reasonable expectation of Fourth Amendment privacy is diminished" under *JL,* 529 U.S. at 274, 120 S.Ct. 1375 (citations omitted), I would hold that the tip letter provided sufficiently credible information to render the attempted search of Wiley's vehicle by his employer constitutional.[3] Thus, although this is an admittedly close case, I respectfully dissent.

---

**3.** I disagree with the majority that considering the governmental interest in prison security in the context of the balancing test somehow double counts this interest. *See supra,* at 1357. The reasonable suspicion standard is applicable not because the search occurred in the prison context, but because the search was performed by a public employer seeking evidence of work-related malfeasance. *Ortega,* 480 U.S. at 725–26, 107 S.Ct. 1492. As *Ortega* made clear, reasonable suspicion should be "judged by the standard of reasonableness under *all* the circumstances." *Id.* (emphasis added).